# Richmond

### LOCAL 333B, UNITED MARINE DIVISION OF INTERNATIONAL LONGSHOREMEN'S ASSOCIATION (A. F. L.), ET AL. v. COMMONWEALTH OF VIRGINIA, AT THE RELATION OF VIRGINIA FERRY CORPORATION.

June 16, 1952.

Record No. 3966.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan, Miller and Whittle, JJ.

The opinion states the case.

*Sidney H. Kelsey,* for the plaintiffs in error.

*J. Lindsay Almond, Jr., Attorney General* and *Barron F. Black, Special Assistant to Attorney General,* for the defendant in error.

HUDGINS, C. J., delivered the opinion of the court.

The Virginia Ferry Corporation, created and organized under the laws of the Commonwealth of Virginia, and hereinafter referred to as the "Corporation," operates a fleet of ferry steamers, used in transporting passengers and motor vehicles between Little Creek, Princess Anne county, and Kiptopeke Beach, Northampton county, across the entrance of Chesapeake Bay. In addition to serving the citizens of Virginia as the sole means of transportation of motor vehicles and passengers between these two points, the ferry constitutes an integral part of the Highway System of Virginia and the United States, being a link in U. S. Route 13. Since January 1, 1951, it has transported an average of 1698 vehicles and 4506 passengers daily.

Local 333B, United Marine Division of International Longshoremen's Association (A. F. L.), hereinafter referred to as the "Union," is the collective bargaining agent of the employees of the Corporation. H. L. Everton is president and William L. Owens is secretary of this Union.

On April 26, 1951, for and on behalf of the Union, H. L. Everton notified the Corporation that the Union represented more than three-fourths of all employees on all vessels operated by the Corporation and requested a conference with the employers to be held on May 3, 1951, to discuss matters pertaining to compensation and conditions of employment of the members of the Union. On the next day, April 27th, the Union, without notice to the Corporation, called a strike of the employees because two of the employees had been discharged. The Corporation re-employed the two men and the strike ended within three hours from its inception.

On May 11, 1951, representatives of the Corporation and the Union met for the purpose of discussing their differences. The Union notified the Corporation that it did not intend to comply with the provisions of the Virginia Public Utilities Labor Act. On May 17, 1951, the Corporation filed its verified bill (a copy of which had been left with the attorney for the Union the evening before) on the equity side of the Court of Law and Chancery of the city of Norfolk, praying that the Union, its officers, agents etc. be enjoined from calling a strike until it had complied with the provisions of Section 40-78 of the Code. At the hearing, the Union and its officers were represented by counsel, who objected to the injunction, on the ground that the Virginia Ferry Corporation was not a public utility within the meaning of the statute (secs. 40-75 to 40-95). The chancellor overruled the objection and entered an injunction order, in which it is stated:

"It is accordingly ADJUDGED, ORDERED and DECREED that Local 333B, United Marine Division of the International Longshoremen's Association (A. F. L.), and H. L. Everton, its President, and the other officers, members and sympathizers of, and persons acting for such association whose names are unknown, be, and they are hereby directed to refrain from engaging in a strike or work stoppage in connection with the operation of the Virginia Ferry Corporation until they comply with all of the provisions of the Virginia Public Utilities Labor Act allowing the Governor and other representatives of

the Commonwealth, the opportunities provided by said Act to investigate, mediate and offer to arbitrate the differences between employers and employees, and to take any other actions provided for in said Act, to the end that the rights of the citizens of the State of Virginia may not be impaired. And said injunction and order shall continue until proof is shown by the said Defendants, either of compliance with the said Virginia Public Utilities Labor Act, or of their intention so to comply therewith.''

On motion of the Union, on May 31, 1951, the cause was removed from the Court of Law and Chancery of the city of Norfolk to the United States District Court for the Eastern District of Virginia. The District Court, on June 25, 1951, remanded the cause to the Court of Law and Chancery of the city of Norfolk.

On June 15, 1951, while the cause was still pending in the United States District Court, the attorney for the Union wrote the Governor of Virginia a letter, a copy of which was mailed to the Corporation. The first paragraph of this letter reads:

''Pursuant to Title 40, Sec. 78 of the Code of Virginia (1950) and in further pursuance of the injunctive order of the Court of Law and Chancery of the City of Norfolk, Virginia, the undersigned union as representative of both the licensed and unlicensed employees of the Virginia Ferry Corporation, three conferences of which you have been notified having been held with the employer in order to negotiate a change in wages and working conditions and said conferences having been fruitless, and further feeling that any arbitration between the parties would also be fruitless, and all negotiations between the parties having been discontinued, this is to notify you that a strike or work stoppage has been called for both licensed and unlicensed personnel of the Virginia Ferry Corporation, said strike or work stoppage being set for 12:00 noon, Friday, July 27, 1951, at which time the employees of all of the vessels of the Virginia Ferry Corporation will cease work as soon after said hour as said vessels are safely docked at the company's docks.''

On receipt of the letter, the Governor, pursuant to the mandate of the statute (sec. 40-78), requested both employers and employees to arbitrate. The Union declined. It, without notice to the Corporation, or to the Governor, on June 22, 1951, at noon, called a strike of the employees. On June 25, 1951, while

the strike was in force and effect, the Corporation filed a petition in the pending chancery suit, alleging that the Union, H. L. Everton, its president, and William L. Owens, its secretary, had violated the injunction order of May 17th, and praying that a rule be issued against the named defendants to show cause why they should not be punished for contempt of court. The show cause order was issued and was made returnable on Thursday, June 28, 1951, at 10:00 a. m.

On June 27, the contempt proceedings were transferred from the equity to the law side of the court, and the style of the case changed to "Commonwealth at relation of the Virginia Ferry Corporation and the Commonwealth of Virginia v. Local 333B United Marine Division of International Longshoremen's Association, H. L. Everton, and William L. Owens."

Defendants filed an answer in which they denied they were guilty of contempt, and alleged that the injunction order of May 17, 1951, was null and void, on the ground that the statutes upon which it was based were unconstitutional. The answer contained a cross-claim alleging that defendants had been damaged in the sum of $50,000, and praying that they be given judgment therefor against the Corporation.

On June 26, 1951, two days before the trial of the contempt proceedings, the Governor, in the name of the Commonwealth, acting under the provisions of Sections 33-202 to 33-208 of the Code, took possession of the property of the Virginia Ferry Corporation and operated the ferry system until October 1, 1951, when, on settlement of the differences between the parties, it was returned to the Corporation. When this fact was brought to the attention of the chancellor in the equity suit, the injunction was dissolved and the suit dismissed.

On June 28, 1951, the trial court, in the contempt proceedings, on consideration of the exhibits and the testimony of nine witnesses, seven introduced by the Commonwealth and two by the defendants, found each of the defendants guilty of criminal contempt, and fixed their punishment as follows: a fine of $7,500 was assessed against Local 333B; a fine of $1,000, and ten days confinement in the city jail, were imposed upon H. L. Everton; a fine of $750, and five days confinement in the city jail, were imposed upon William L. Owens. All fines were made payable to the Commonwealth. To review this judgment the three defendants obtained this writ of error.

Defendants' first contention is that the trial court committed

reversible error in transferring the contempt proceedings from the equity to the law side of the court.

■ Proceedings for contempt of court are of two classes,— those prosecuted to preserve the power and vindicate the dignity of the court and those to preserve and enforce the rights of private parties. The former are criminal and punitive in their nature; the latter are civil, remedial and coercive in their nature, and the parties chiefly interested in their conduct and prosecution are those individuals for the enforcement of whose private rights and remedies the original suit was instituted. *Roanoke Water Works Co.* v. *Roanoke Glass Co.,* 151 Va. 229, 144 S. E. 460; *Deeds* v. *Gilmer,* 162 Va. 157, 261, 174 S. E. 37; *Drake* v. *National Bank of Commerce,* 168 Va. 230, 190 S. E. 302, 109 A. L. R. 1517; *Gloth* v. *Gloth,* 158 Va. 98, 163 S. E. 351; *Bessette* v. *Conkey Co.,* 194 U. S. 324, 24 S. Ct. 665, 48 L. ed. 997; 4 Michie's Jur., Contempt, sec. 3, p. 242; 12 Am. Jur., Contempt, sec. 6, p. 392.

■ There is no comprehensive test by which contempts may be classified as either civil or criminal. It was stated by Mr. Justice Lamar, in *Gompers* v. *Bucks Stove, etc., Co.,* 221 U. S. 418, 441, 31 S. Ct. 492, 55 L. ed. 797, 34 L. R. A. (N. S.) 874, that ''Contempts are neither wholly civil nor altogether criminal. And 'it may not always be easy to classify a particular act as belonging to either one of these two classes. It may partake of the characteristics of both.' *Bessette* v. *Conkey Co.,* 194 U. S. 324, 329, 24 S. Ct. 665, 48 L. ed. 997. But in either event, and whether the proceedings be civil or criminal, there must be an allegation that in contempt of court the defendant has disobeyed the order, and a prayer that he be attached and punished therefor. It is not the fact of punishment but rather its character and purpose that often serve to distinguish between the two classes of cases.

\* \* \* \* \* \*

''It is true that either form of imprisonment has also an incidental effect. For if the case is civil and the punishment is purely remedial, there is also a vindication of the court's authority. On the other hand, if the proceeding is for criminal contempt and the imprisonment is solely punitive, to vindicate the authority of the law, the complainant may also derive some incidental benefit from the fact that such punishment tends to prevent a repetition of the disobedience. But such indirect consequences will not change imprisonment which is merely coercive

and remedial, into that which is solely punitive in character, or *vice versa.*"

In *Lamb* v. *Cramer,* 285 U. S. 217; 52 S. Ct. 315, 76 L. ed. 715, it was said: "It is the purpose of the punishment rather than the character of the act punished, which determines whether the proceeding is for civil or criminal contempt."

The two classes of contempt were discussed and distinguished by Mr. Chief Justice Taft in *Ex Parte Grossman,* 267 U. S. 87, 45 S. Ct. 332, 69 L. ed. 527, 38 A. L. R. 131, 136. There he said: "For civil contempts, the punishment is remedial and for the benefit of the complainant, and a pardon cannot stop it. For criminal contempts, the sentence is punitive in the public interest to vindicate the authority of the court and to deter other like derelictions." Among other authorities so holding are *Doyle* v. *London Guarantee, etc., Co.,* 204 U. S. 599, 27 S. Ct. 313, 51 L. ed. 641; *Root* v. *MacDonald,* 260 Mass. 344, 157 N. E. 684, 54 A. L. R. 1422.

The petition upon which the rule to show cause was issued, alleged that (1) the injunction was in full force and effect; (2) the unsuccessful attempt to remove the case to the United States District Court; (3) the failure of defendant to comply with the Virginia Public Utilities Labor Act, and (4) in defiance of the provisions of the injunction order, the Union and its named officers had instigated a strike or work stoppage, which had resulted in cessation of the operation of the ferries, to the detriment of the public, and prayed that a rule be issued against defendants to show cause why they should not be punished for contempt of court. While the petition was signed by the Virginia Ferry Corporation and verified by one of its officers, it did not pray for the preservation or enforcement of a private right. The sole object of the proceeding was to punish those who had violated the injunction order, the statutory laws of the Commonwealth, and to protect the public from inconvenience, loss and injury, and to preserve the power and vindicate the dignity of the court.

The trial of the charges of contempt was a contest between the public and the named defendants and not between them and the Corporation. The transfer from the equity to the law side enabled the court and the parties to keep the contempt proceedings separate and distinct from the suit in equity, and was in accord with recognized and approved procedure in such cases.

The Commonwealth, who became the plaintiff in the trial of the charges for contempt, introduced no evidence tending to prove that any right or privilege of the Virginia Ferry Corporation had been violated such as would have been the case if the proceedings had been regarded by the parties and the court as a proceeding for civil contempt. The evidence introduced tended to show loss and great inconvenience to the general public by the stoppage of motor vehicle traffic on Route 13, the stranding of itinerant farm workers, and loss to military personnel. The fines imposed were for the benefit of the Commonwealth and not for the benefit of the Ferry Corporation.

■ "A civil contempt may be prosecuted in the cause out of which it arose and not as a separate proceeding with a title of its own. A criminal contempt may properly be in the name of the state or simply entitled in a manner to indicate that the proceeding is criminal rather than civil." 12 Am. Jur., Contempt, sec. 66, p. 433. See also 4 Michie's Jur., Contempt, sec. 12, pp. 259, 260, and secs. 22 to 29, pp. 267-275.

In *United States* v. *United Mine Workers*, 330 U. S. 258, 67 S. Ct. 677, 91 L. ed. 884, the president of the Union and the Union, in one proceeding, were adjudged guilty of both criminal and civil contempt for violating a temporary restraining order issued by the court in a labor dispute arising while the coal mines were in the possession of and operated by the Government. Objection was made to the proceedings on the ground that the notice to show cause did not contain the words "criminal contempt," and that it was prejudicial error to try in one proceeding both criminal and civil contempt. Speaking to the point, the court said:

"Even if it be the better practice to try criminal contempt alone and so avoid obscuring the defendant's privileges in any manner, a mingling of civil and criminal contempt proceedings must nevertheless be shown to result in substantial prejudice before a reversal will be required. That the contempt proceeding carried the number and name of the equity suit does not alter this conclusion, especially where, as here, the United States would have been the complaining party in whatever suit the contempt was tried. In so far as the criminal nature of the double proceeding dominates and in so far as the defendants' rights in the criminal trial are not diluted by the mixing of civil with criminal contempt, to that extent is prejudice avoided. Here, as we have indicated, all rights and privileges

of the defendants were fully respected, and there has been no showing of substantial prejudice flowing from the formal peculiarities of defendants' trial.''

The order in the instant case separating the contempt proceedings from the chancery suit, transferring the former to the law side of the court, and amending the petition by making the Commonwealth a party plaintiff to the cause, was in accord with established rules of pleading, and calculated to expedite the trial, avoid confusion, and to give the parties a fair hearing on the pertinent issues.

Defendants' second contention is that the Virginia Public Utilities Labor Act (Code, 1950, secs. 40-75 to 40-95, inclusive) is unconstitutional, and that the injunction order of May 17, 1951, based thereon, is null and void.

The case is pending in this court on a writ of error granted defendants in the contempt proceedings, wherein fines and jail sentences were imposed. The questions raised in the equity suit between the parties in which the injunction order was awarded, are not before this court. The record and briefs disclose that the defendants were represented in court when the petition for the injunction was presented and that they opposed the granting of the injunction, on the ground that the Virginia Public Utilities Labor Act did not apply to the business conducted by the Corporation. No exception to the ruling of the court on this question was taken, nor was the question argued in this court; hence we express no opinion thereon.

While the defendants did not raise the question of the constitutionality of the Virginia Public Utilities Labor Act in the equity suit, they had full opportunity after the injunction was awarded to raise the question, if they so desired, by a motion to dissolve. This they failed to do. It was raised for the first time after the injunction had been awarded, its terms violated, the rule to show cause had been served, and defendants were before the court to answer the charge of criminal contempt.

The trial judge informed defendants they had a right to raise the question of the constitutionality of the Virginia Public Utilities Labor Act in the equity suit, and that he would hear them on that question at any appropriate time, but he would not permit the question to be raised in the contempt proceedings, as it constituted a collateral attack upon a judgment of a court of competent jurisdiction.

■ The general rule is that where a court has jurisdiction of the parties and the subject matter to pronounce a judgment, such judgment cannot be attacked collaterally even if the statute upon which it is based is later declared to be unconstitutional. In *Howat* v. *Kansas,* 258 U. S. 181, 189, 42 S. Ct. 277, 66 L. ed. 550, Chief Justice Taft said: "An injunction duly issuing out of a court of general jurisdiction with equity powers upon pleadings properly invoking its action, and served upon persons made parties therein and within the jurisdiction, must be obeyed by them however erroneous the action of the court may be, even if the error be in the assumption of the validity of a seeming but void law going to the merits of the case. It is for the court of first instance to determine the question of the validity of the law, and until its decision is reversed for error by orderly review, either by itself or by a higher court, its orders based on its decision are to be respected, and disobedience of them is contempt of its lawful authority, to be punished. *Gompers* v. *Bucks Stove, etc., Co.,* 221 U. S. 418, 450, 31 S. Ct. 492, 55 L. ed. 797, 34 L. R. A. (N. S.) 874; *Toy Toy* v. *Hopkins,* 212 U. S. 542, 548, 29 S. Ct. 416, 53 L. ed. 644. See also *United States* v. *Shipp,* 203 U. S. 563, 573, 27 S. Ct. 165, 51 L. ed. 319."

■ We said in *Deeds* v. *Gilmer,* 162 Va. 157, 261, 174 S. E. 37: "Though an injunction may have been erroneously granted, unless it is absolutely void, it is the duty of the parties enjoined to obey it scrupulously, and they will be held to a strict observance of it. If they violate the order themselves, or assist or encourage others to violate it, they may be punished by the court for their contempt."

In *Robertson* v. *Commonwealth,* 181 Va. 520, 537, 25 S. E. (2d) 352, 146 A. L. R. 966, we held that "The fact that a witness may disagree with the court on the propriety of its ruling is, of course, no excuse for his not complying with it. The proper method of challenging the correctness of an adverse ruling is by an appeal and not by disobedience."

We said in *Buchanan* v. *Buchanan,* 170 Va. 458, 464, 197 S. E. 426, 116 A. L. R. 688, that "A successful collateral attack made upon a judgment of a court of general jurisdiction must show the judgment to be void, not merely voidable."

■ Mr. Chief Justice Vinson, in *United States* v. *United Mine Workers,* 330 U. S. 258, 293, 67 S. Ct. 677, 91 L. ed. 884, said: "* * * We find impressive authority for the proposition that an order issued by a court with jurisdiction over the sub-

ject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings. This is true without regard even for the constitutionality of the Act under which the order is issued.'' In support of this principle the Chief Justice cited the following cases: *Howat* v. *Kansas*, 258 U. S. 181, 42 S. Ct. 277, 66 L. ed. 550; *Russell* v. *United States*, 86 F. (2d) 389; *Locke* v. *United States*, 75 F. (2d) 157; *O'Hearne* v. *United States*, 62 App. D. C. 285, 66 F. (2d) 933; *Schwartz* v. *United States*, 217 F. 866; *Brougham* v. *Oceanic Steam Nav. Co.*, 205 F. 857; *Blake* v. *Nesbet*, 144 F. 279.

Defendants' next contention is that the statute (sec. 18-255 (5) ) forbids a court to impose punishment for contempt upon a party for violation of an injunction order unless such order is valid in all respects.

■ This contention is contrary to the authorities heretofore cited and is expressly repudiated in *Robertson* v. *Commonwealth*, 181 Va. 520, 537, 25 S. E. (2d) 352, 146 A. L. R. 966, where this court, speaking through Mr. Justice Eggleston, said: ''Consequently, the authorities are in accord that where the court has jurisdiction of the parties and of the subject matter of the suit and the legal authority to make the order, a party refusing to obey it, however erroneously made, is liable for contempt. Such order, though erroneous, is lawful within the meaning of contempt statutes until it is reversed by an appellate court.''

Defendants' last and final contention is that the punishment imposed is excessive.

The evidence fully supports the finding of the trial court, as stated in its judgment, that the defendants ''* * * are each and all guilty of the charges of criminal contempt, in that, to-wit, on June 22, 1951, they wilfully violated the injunction of this Court * * * through their acts as detailed in the evidence.''

■ Punishment for such contempt is punitive in its nature and is imposed for the purpose of preserving the power and vindicating the dignity of the court. ''The interests of orderly government demand that respect and compliance be given to orders issued by courts possessed of jurisdiction of persons and subject matter. One who defies the public authority and willfully refuses his obedience does so at his peril. In imposing a fine for criminal contempt, the trial judge may properly take into consideration the extent of the willful and deliberate defiance of the court's order, the seriousness of the conse-

quences of the contumacious behavior, the necessity of effectively terminating the defendant's defiance as required by the public interest, and the importance of deterring such acts in the future. Because of the nature of these standards, great reliance must be placed upon the discretion of the trial judge." *United States* v. *United Mine Workers,* 330 U. S. 258, 303, 67 S. Ct. 677, 91 L. ed. 884.

The Union, on June 22, 1951, in open defiance of the injunction order, wilfully and deliberately called a strike, or authorized its members to engage in a work stoppage, at a time they knew an unusually large number of trucks would be engaged in transporting potatoes from the south to the north over these ferries; at a time when itinerant farm workers used the ferries going to farms on the Eastern Shore of Virginia and Maryland, and when such stoppage would cause a heavy loss to shippers and unusual hardships upon itinerant workers. During the potato season, from June 22nd to the middle of July, the ferries transported approximately 5,000 passengers and 2,000 motor vehicles daily.

Theodore P. Dodd, an employee of the Virginia State Employment Service at Little Creek, testified that because of the stoppage of the ferries, more than 800 itinerant workers were stranded at Little Creek; that they were poor, without funds, and unable to get to their work. During the period from June 22nd until the Governor took over the property of the Corporation on the 26th, the workers slept in trucks, on the concrete, under the cars and in the weeds; that numerous small children accompanying their parents, were without food. One little girl told the witness that she had not eaten for two days. The pitiful condition of these itinerant workers became so acute that the Red Cross assumed responsibility for feeding them.

Defendants filed no plea of penitence or disclaimer. They did not rely upon the advice of counsel. They introduced no evidence in mitigation of their wilful acts, or to show lack of intent to violate the injunction order. Before determining the degrees of punishment the court gave defendants an opportunity to introduce evidence tending to mitigate the offense as well as to show their financial worth.

The meager testimony introduced by defendants disclosed that the Union had an annual income of at least $28,000, which did not include the initiation fee of $13.00 charged each new

member; that H. L. Everton received a salary of $500 a month, and W. L. Owens $75.00 a week.

Courts are clothed with power and charged with the duty of maintaining the dignity of the law. Decrees are mandates of the courts and courts must have power to enforce them if organized society is to be maintained. The degree of punishment for contempt is within the sound discretion of the trial court. Imprisonment for such offense is severe. It should not be imposed except where it is proven that the conduct of the party charged with criminal contempt has been contumacious.

A consideration of the entire record fails to show that the trial court abused its discretion in fixing the different degrees of punishment imposed upon the three defendants.

The judgment is affirmed.

*Affirmed.*