JOHN L. BAGWELL, SPECIAL COMMISSIONER

v.

INTERNATIONAL UNION, UNITED MINE WORKERS OF
AMERICA, ET AL.

Record No. 910634

INTERNATIONAL UNION, UNITED MINE WORKERS OF
AMERICA, ET AL.

v.

CLINCHFIELD COAL COMPANY, ET AL.

Record No. 920299

November 6, 1992

Present: Carrico, C.J., Compton, Stephenson, Whiting, Lacy, and Hassell, JJ.,
and Harrison, Retired Justice

*William B. Poff (Clinton S. Morse; Frank K. Friedman; Woods, Rogers & Hazelgrove*, on briefs), for appellant. (Record No. 910634)

*Andrew P. Miller (John A. Gibney, Jr.; James J. Vergara, Jr.; Shuford, Rubin, Gibney & Dunn; Vergara & Associates; Dickstein, Shapiro & Morin*, on brief), for appellees. (Record No. 910634)

*Amicus Curiae:* Center on National Labor Policy, Inc. (Michael S. Arif; Michael E. Avakian; Martin & Arif, on brief). (Record No. 910634)

*Andrew P. Miller (Dickstein, Shapiro & Morin,* on briefs), for appellants. (Record No. 920299)

No brief or argument for appellees. (Record No. 920299)

*Amicus Curiae:* John L. Bagwell, Special Commissioner. William B. Poff (Clinton S. Morse; Frank K. Friedman; Woods, Rogers & Hazelgrove, on brief). (Record No. 920299)

*Amicus Curiae:* Virginia Chamber of Commerce. (W. Carter Younger; Dana L. Rust; Rodney A. Satterwhite; McGuire, Woods, Battle & Boothe, on brief). (Record No. 920299)

JUSTICE STEPHENSON delivered the opinion of the Court.

In these consolidated appeals, the principal issue we address involves the validity and enforceability of certain contempt fines imposed by the trial court against International Union, United Mine Workers of America and International Union, United Mine Workers of America, District 28 (collectively, the Union) for the Union's violation of the court's injunction.

I

In early April 1989, the Union called a strike against Clinchfield Coal Company and Sea "B" Mining Company (collectively, the Company) after the expiration of a collective bargaining agreement between the parties. Thereafter, the Company undertook to conduct its operations by using replacement workers.

On April 12, 1989, the Company filed a verified bill of complaint against the Union seeking to have the trial court enjoin the Union from engaging in certain alleged unlawful activities. On April 13, 1989, following an evidentiary hearing, the court enjoined the Union and its members from obstructing certain entrances to the Company's property, from throwing rocks and other objects at vehicles and persons engaged in the Company's operations, from placing objects designed to cause damage to vehicle tires upon any surface that might be used by vehicles engaged in the Company's operations, and from intimidating and threatening physical harm to persons engaged in the Company's operations and to members of

their families. The court also limited the number of pickets at various locations. On April 21, 1989, the court amended and strengthened its injunction upon a finding that, notwithstanding the initial injunction, "serious incidents of mass picketing, roving picketing, violence, threats, intimidation, and property destruction have continued."

For the duration of the strike, the Union engaged in wholesale violations of the court's injunction. The court responded to these violations by entering a series of orders finding the Union guilty of civil contempt. In an effort to compel compliance with its injunction, the court established a prospective fine schedule. When violations persisted, fines were assessed against the Union in accordance with the previously established schedule.

On September 21, 1989, the court appointed special commissioners to collect the increasing, but unpaid, fines. John L. Bagwell, appellant in Record No. 910634, later was substituted as special commissioner to collect the fines.

The Union appealed eight contempt orders to the Court of Appeals, contending that the fines assessed were criminal sanctions imposed in a civil proceeding and thereby violative of certain constitutional guarantees. Five of the orders are involved in Record No. 910634, and the remaining three orders are involved in Record No. 920299.

Prior to oral argument in the Court of Appeals, the Union and the Company settled the underlying strike and their litigation. Thereafter, the Union and the Company moved the trial court to vacate all fines. The trial court vacated those fines that were payable to the Company.[1] The trial court, however, refused to vacate the fines payable to the Commonwealth and to Russell and Dickenson Counties. These fines are the subject of these appeals. In its reply briefs in the Court of Appeals, the Union asserted that the strike settlement mooted the subject fines.

While the first appeal (Record No. 910634) was pending in the Court of Appeals, but after oral argument, Bagwell petitioned to be made a party in the appeal or, in the alternative, to be permitted to file a brief *amicus curiae*. The Court of Appeals refused to allow Bagwell to intervene but permitted him to file an *amicus curiae* brief. Subsequently, the Court of Appeals ruled, in a two-to-one

---

[1] It is not clear from the record that all fines payable to the Company were expressly vacated. The parties, however, agree that these fines were vacated.

decision, that the fines were mooted by the settlement of the strike. *United Mine Workers* v. *Clinchfield Coal Co.*, 12 Va. App. 123, 402 S.E.2d 899 (1991).

We awarded Bagwell an appeal in Record No. 910634. At the same time, we certified Record No. 920299 from the Court of Appeals and consolidated the two appeals.

## II

The evidence of injunction violations is too voluminous for a detailed recitation. It consists of many days of testimony by approximately 260 witnesses and numerous exhibits. Significantly, the Union has not challenged the sufficiency of this evidence in these appeals.

In the early stages of the strike, the violations were largely of a nonviolent nature consisting mainly of mass picketing and sit-ins to block ingress to and egress from the Company's property. In the first contempt order, entered on May 18, 1989, the court found 72 separate violations of its injunction, only 15 of which were violent.[2] In that order, the court established its prospective fine schedule for future injunction violations. The schedule provided for fines of $100,000 for each violent violation and $20,000 for each nonviolent violation.

The court conducted a second contempt hearing on June 2, 1989. This hearing produced evidence of continued blockage of the Company's entrances and exits by mass picketing and sit-ins. By an order entered June 7, 1989, the Union again was held in contempt, and fines were imposed in accordance with the established fine schedule. These fines, totalling $2,465,000, were payable to the Commonwealth. The contempt order stated that "[i]t is the Court's intention that these fines are civil and coercive."

Following the second contempt order, the Union changed its strategy. The Union planned to delay and impede the Company's movement of coal by the use of slow-moving automobile convoys manned by Union members and out-of-state sympathizers. To support this effort, the Union opened "Camp Solidarity" as a place for the participants to congregate and organize the convoys. Approximately 1,000 persons would stay at the camp.

---

[2] The court imposed $642,000 in fines, $424,000 of which were suspended, for these violations. These fines subsequently were vacated because the trial court determined that they were "criminal in nature."

A multitude of violent acts accompanied this new strategy, including gunfire directed at coal truck drivers' vehicles. Consequently, on July 27, 1989, the court entered a third contempt order. In this order, the court found the Union guilty of 46 injunction violations and imposed fines totalling $4,465,000, of which $2,000,000 was ordered to be paid to the Commonwealth, $1,465,000 to Russell County, and $1,000,000 to Dickenson County. In its pronouncement from the bench following the third contempt hearing, the court stated, *inter alia*, the following:

> [The court] find[s] that . . . [the Union] and [its] members have engaged in acts of violence that are directly related to their picketing in this labor dispute and that they have been characterized by mass picketing and blocking of rights of ways, both public and private; the hurling of rocks and other missiles at vehicles; . . . and . . . have intimidated or attempted to intimidate by threats and by violence members of this community who are attempting to exercise their right to go to work and make a living under the Virginia law.
>
> . . . .
>
> This court's injunction is designed to keep the peace here in Virginia and to be sure that . . . the citizens of this state, in these communities, can live in peace, free from the acts of terror which have been committed upon this community.

Following the third contempt order, the court heard testimony from more than 60 witnesses concerning escalated violence. The record is replete with evidence of incidents of rock-throwing and the use of "jackrocks."[3] Coal truck drivers and Company personnel and members of their families were subjected to attacks and intimidation. Numerous vehicles were damaged by various devices. The record also discloses that Union officials took active roles in these unlawful activities.

Thus, on September 21, 1989, the Union again was found in contempt for 65 violent and 24 nonviolent violations of the injunction. Following the established fine schedule, the court fined the Union a

---

[3] A "jackrock" is made from nails welded together in such a way that a point is always aimed upward when the device is thrown upon the ground. These devices are designed to puncture vehicle tires.

total of $16,900,000 and directed that it be paid as follows: $6,000,000 to the Commonwealth, $4,500,000 to Russell County, and $3,000,000 to Dickenson County. The court also directed that the remainder, $3,400,000, be paid to the Company; however, this fine was vacated subsequently.

In its fifth contempt order, entered on October 9, 1989, the court found 69 additional violent violations of its injunction. The acts were similar to those previously described, to-wit: rock-throwing, jackrocking, intimidation, etc. The court, in accordance with the established fine schedule, assessed the Union an additional $6,900,000 in fines, of which $2,500,000 was made payable to the Commonwealth, $1,200,000 was made payable to Dickenson County, and $1,800,000 was made payable to Russell County. The court directed that $1,400,000 be paid to the Company; however, this fine was vacated subsequently.

By its sixth, seventh, and eighth contempt orders, which are the subject of appeal in Record No. 920299, the trial court found continuing injunction violations which were similar in nature to the violations previously described. In addition, the trial court found that the Union had taken possession of the Company's coal processing plant on September 17, 1989, and had unlawfully occupied it for four days.

The court, in the sixth contempt order entered November 16, 1989, found 72 injunction violations, 40 of which were violent. These acts of violence included physical beatings and death threats. Fines totalling $15,800,000 were levied in accordance with the established fine schedule. The court later vacated $3,000,000 of these fines which were to have been paid to the Company. The court directed that the remainder of the fines be paid as follows: $5,700,000 to the Commonwealth, $4,350,000 to Russell County, and $2,750,000 to Dickenson County.

Following a hearing on November 15 and 16, 1989, the court entered its seventh contempt order. In this order, entered on December 15, 1989, the court, in accordance with the established fine schedule, imposed fines totalling $7,300,000 for 31 violations, 24 of which were violent. The court directed that the fines be paid as follows: $2,650,000 to the Commonwealth, $2,000,000 to Russell County, and $1,250,000 to Dickenson County. The court also directed that the remainder, $1,400,000, be paid to the Company; however, this fine was vacated subsequently.

On December 7 and 8, 1989, the Union again was before the court for violating the injunction. In its eighth contempt order, entered on December 15, 1989, the court found 38 violations of its injunction, 32 of which were violent, and, following its established fine schedule, imposed fines of $10,300,000, of which $3,700,000 was made payable to the Commonwealth, $2,800,000 was made payable to Russell County, and $1,800,000 was made payable to Dickenson County. The court later vacated $2,000,000 of these fines, which were to have been paid to the Company.

### III

The Union has moved for a dismissal of Bagwell's appeal (Record No. 910634) on four grounds. First, the Union contends that Bagwell does not have standing to appeal because he has no personal interest in the subject of this litigation. The Union asserts that, as a special commissioner of the court, Bagwell is merely a ministerial officer of the court. Therefore, the Union concludes, Bagwell cannot attain the status of a party. According to the Union, only the Company, the adverse litigant, has standing to defend and collect contempt fines payable to the Commonwealth or its political subdivisions.

In order to determine whether Bagwell is a ministerial officer of the court or someone entitled to party status, we must look to the purpose of his appointment. We also must look to the powers and duties granted to him by the court.

For more than six months, the trial court had tried, without success, to curb the Union's unlawful conduct by imposing contempt fines. Finally, by exercising its inherent equity power, the court appointed special commissioners to collect the accumulated fines. The initial order of appointment stated as follows:

It appearing to the Court that the defendants have not paid any of the previously liquidated fines, and the defendants advising the Court that no efforts are foreseen to effect payment of such fines, it is therefore FURTHER ORDERED that . . . . [the]special commissioners are directed to proceed immediately to collect all such fines and are authorized and empowered to undertake all necessary or convenient means of collection, including, but not limited to, docketing, interrogatories, levy, execution, garnishment, attachment, and creditor's bill,

wherever the defendants may have property or assets, until all such fines are paid in full. In addition, said special commissioners upon petition to the Court for leave so to do shall have the power to employ counsel and accountants to assist them in their work. All fines collected shall be paid to the Clerk of this Court and distributed by the Court.

Subsequently, the court appointed Bagwell in the place of the original special commissioners. The court, in a pronouncement from the bench, made clear Bagwell's role:

The Court is . . . appointing Mr. Bagwell to act in the stead of the Commonwealth's Attorneys of these two jurisdictions which are affected, Russell and Dickenson Count[ies], Virginia, as both of their Commonwealth's Attorneys have asked to be disqualified. . . . [The court] want[s] this Order to reflect that [Bagwell] is appointed to act as Commonwealth Attorney for any collection procedures that are necessarily implemented by the Commonwealths' Attorneys.

The order of appointment provides additional insight into Bagwell's powers and duties:

John L. Bagwell is hereby appointed special commissioner in the place and stead of the former special commissioners and as attorney to act in the place and stead of the Commonwealth's Attorneys for Russell and Dickenson Counties to collect all unpaid and unbonded fines. . . . John L. Bagwell, who has been designated to succeed [the original commissioners] as special commissioner, shall succeed to all the functions, powers, duties and obligations of the prior special commissioners. . . . The said John L. Bagwell shall have authority to take all actions as may be necessary to collect the fines including but not limited to the filing of legal actions, pleadings, notices, liens, the retaining of other attorneys, accountants experts and others necessary, but with prior approval of the Court, in any jurisdiction necessary to effect the intent of this Order.

The Union relies upon *Brown* v. *Howard*, 106 Va. 262, 55 S.E. 682 (1906), in support of its contention that Bagwell has no standing to appeal. It argues that *Brown* "is dispositive as to the restricted parameters" of the role of a special commissioner.

In *Brown*, a special commissioner appointed in a court's decree to sell real property sought to appeal the court's action in setting aside that decree. 106 Va. at 263, 55 S.E at 683. In dismissing the appeal for want of jurisdiction, we noted that "[t]he record fails to disclose that the [special commissioner] has any personal interest in the subject matter of [the] litigation." *Id.* We also stated that the special commissioner was "a mere ministerial officer of the court, whose powers and duties, *ipso facto*, ceased upon the setting aside of the decree of sale." *Id.*

*Brown* is distinguishable from the present case because Bagwell, unlike the special commissioner in *Brown*, is clothed with broad powers and duties. Indeed, Bagwell was appointed to act in the place and stead of the attorneys for the Commonwealth, and, as such, he is the special attorney for the Commonwealth and the Commonwealth's agent for the collection of the fines. Additionally, unlike the special commissioner in *Brown*, Bagwell's powers and duties have not been terminated, but, according to the order of appointment, are to continue "until all . . . fines are paid in full." Thus, by intervening in and prosecuting this appeal, Bagwell would be discharging the duties of his office. *Brown*, therefore, is inapposite.

■ Accordingly, we hold that, under the particular facts and circumstances of this case, Bagwell is the one party who does have standing to represent the interests of the Commonwealth and two of her counties in defending the validity of the subject fines.

Second, the Union contends that, even if Bagwell has standing to appeal, he should not be permitted to intervene in the first instance on appeal. Third, the Union contends that, even if a party may intervene in the first instance on appeal, the granting or denying of a motion to intervene is discretionary with a court and that the Court of Appeals did not abuse its discretion in denying the motion.

■ Intervention is "[t]he procedure by which a third person, not originally a party to the suit, but claiming an interest in the subject matter, comes into the case, in order to protect his right or interpose his claim." *Black's Law Dictionary* 820 (6th ed. 1990). We previously determined that Bagwell claims an interest in the subject matter of this appeal, *i.e.*, the fines payable to the Commonwealth and

to the counties. Unquestionably, he sought intervention in order to protect his right, to interpose his claim, and to discharge successfully the duties of the office imposed upon him by the court.

We previously have not decided whether a party may intervene in the first instance on appeal. In the present case, the Company suddenly withdrew as appellee while this appeal was pending in the Court of Appeals. Consequently, only Bagwell, as special commissioner, could have urged the Court of Appeals to uphold the validity of the subject fines. He was the logical replacement for the Company in that role. Moreover, the Union could not have been prejudiced by his intervention. Thus, under the circumstances of this case, we hold that the Court of Appeals erred in denying Bagwell's motion to intervene.

Finally, the Union contends that, even if Bagwell had the right to intervene and the Court of Appeals erred in denying intervention, Bagwell's appeal was not filed timely. We do not agree. The order denying intervention was not a final, appealable order because it did not dispose of the whole subject matter of the case. *See Burns* v. *The Equitable Associates*, 220 Va. 1020, 1028, 265 S.E.2d 737, 742 (1980). Bagwell's appeal from the Court of Appeals' order disposing of the whole subject matter of the case was filed timely.[4]

## IV

Having determined the procedural issues, we now consider whether the fines payable to the Commonwealth and to the two counties are valid and enforceable. In Record No. 910634, the Court of Appeals assumed, without deciding, that the subject fines were civil sanctions and determined that the fines were coercive, rather than compensatory. 12 Va. App. at 128-29, 402 S.E.2d at 902-03. The Court of Appeals further held that ''civil contempt fines imposed during or as a part of a civil proceeding between private parties are settled when the underlying litigation is settled by the parties and the court is without discretion to refuse to vacate such fines.'' *Id.* at 133, 402 S.E.2d at 905. Accordingly, the Court of Appeals ruled that the fines involved in this appeal are moot. *Id.* at 134, 402 S.E.2d at 905. Bagwell assigns error to this ruling.

---

[4] We also reject the Union's claim that Bagwell, by the filing of a brief *amicus curiae* in the court of appeals, waived his objection to the denial of his motion to intervene. By accepting a less favorable ruling, a litigant does not waive his objection to a denial of what would have been a more favorable ruling.

Bagwell contends that the subject fines are prospective, coercive, civil contempt fines that are not rendered moot by the settlement of the underlying labor dispute. The Union contends that the fines are criminal in character and, therefore, are invalid because they were imposed without the mandated constitutional protections. The Union further contends that, even if the fines are civil, the Court of Appeals properly vacated the fines as moot.

## A

■ Contempts are classified as either "criminal" or "civil," although each " 'may partake of the characteristics' " of the other. *Gompers* v. *Bucks Stove & Range Co.*, 221 U.S. 418, 441 (1911). "It is not the fact of punishment but rather its character and purpose, that often serve to distinguish between the two classes of cases." *Id.*

■ The punishment, whether fine or imprisonment, is deemed to be criminal if it is determinate and unconditional, and such penalties "may not be imposed on someone who has not been afforded the protections that the Constitution requires of such criminal proceedings." *Hicks* v. *Feiock*, 485 U.S. 624, 632-33 (1988). The punishment is deemed to be civil if it is conditional, and a defendant can avoid such a penalty by compliance with a court's order. *Id.* at 633. Civil contempt sanctions are either compensatory or coercive. Compensatory, civil contempt sanctions compensate a plaintiff for losses sustained because a defendant disobeyed a court's order. Coercive, civil contempt sanctions are imposed to compel a recalcitrant defendant to comply with a court's order. *See, e.g., United States* v. *United Mine Workers*, 330 U.S. 258, 303-04 (1947); *Gompers*, 221 U.S. at 448; *United States* v. *Darwin Const. Co., Inc.*, 873 F.2d 750, 753-54 (4th Cir. 1989).

To determine whether the fines imposed in the present case are valid and enforceable, we first must determine what type of contempt fines were assessed by the trial court. After its first contempt hearing, the trial court found that the Union had committed numerous injunction violations and imposed fines therefor. These fines were determinate and unconditional. Subsequently, however, the court vacated these fines, concluding that they were criminal in nature and, therefore, violative of the Federal Constitution. Clearly, the trial court ruled correctly in vacating these fines.

Significantly, the court, in its first contempt order, established a prospective fine schedule in an effort to coerce the Union into complying with the court's injunction. The judge clearly stated his position at that time.

[T]he union and its members are responsible for how much money . . . is going to be paid, not this Court, not the company, not anyone else. If you go out and violate the law, you are taking that action of your own free will and . . . you will pay the consequences, because it is your act.

. . . .

I firmly believe that the fate of the union with regard to these violations is in the hands of those members and leadership that we have seen here in court today. . . . I sincerely hope that you will be able to conduct yourself in a law abiding manner. . . .

Following the second contempt hearing, the court found that the Union had committed numerous additional violations of its injunction. Accordingly, the court imposed fines in accordance with the previously established fine schedule. Again, the judge made clear the reason for the fine schedule, stating, ''I don't know how much money these two defendants are willing to pay before they will obey the law. I hope [the fine schedule] will deter any further violations.''

As time passed, the violations increased in frequency and became more violent. Indeed, after the third contempt hearing, the court described the situation as follows:

[T]his . . . has been a strike . . . that is characterized by violence and terrorism on the part of the members of the [local district] acting for the International Union in carrying out this strike here in Southwest Virginia against the Plaintiffs. It has become a situation that this Court feels is intolerable.

■ It is abundantly clear from the record that the court established the fine schedule and thereafter imposed the subject fines in an effort to coerce the Union into compliance with the court's injunction. The court continued to make clear that the Union had the power to avoid imposition of fines.

The Court is convinced, as [it has] stated numerous times, that this is a civil contempt proceeding. The only way that any fines or any penalties can be assessed is for the defendants to fail to comply with the Court's injunctive orders and the laws of the Commonwealth of Virginia as [they] are stated or . . . outlined in the order. This is not punitive. It is compulsory. It is designed to compel compliance and therefore it is not criminal in nature but civil.

Notwithstanding the trial court's clear intent and its consistent imposition of fines pursuant to the previously established fine schedule, the Union asserts that the fines are criminal in nature and, therefore, invalid. The Union acknowledges that civil contempt fines are valid when they are imposed to coerce a party to perform an *affirmative act*. The Union contends, however, that where, as here, the injunction *prohibits* the doing of an act, all fines imposed for violating the prohibition are criminal sanctions. We reject this contention because we think it presents a distinction without a difference.

When a court orders a defendant to perform an affirmative act and provides that the defendant shall be fined a fixed amount for each day he refuses to comply, the defendant has control of his destiny. The same is true with respect to the court's orders in the present case. A prospective fine schedule was established solely for the purpose of coercing the Union to refrain from engaging in certain conduct. Consequently, the Union controlled its own fate.

Thus, we hold that the fines in question are valid, coercive, civil fines. It is important to reiterate that the Court of Appeals also concluded that "these fines [are] coercive civil fines, not compensatory civil fines." 12 Va. App. at 129, 402 S.E.2d at 903. Furthermore, other courts share our view respecting the validity of employing a prospective, civil fine schedule to coerce defendants into future compliance with a court's *prohibitory* injunction. *See, e.g., New York State Nat. Organization For Women* v. *Terry*, 886 F.2d 1339, 1351 (2d Cir. 1989), *cert. denied*, 495 U.S. 947 (1990); *Aradia Women's Health Center* v. *Operation Rescue*, 929 F.2d 530, 532-33 (9th Cir. 1991); *Clark* v. *International Union, UMWA*, 752 F.Supp. 1291, 1297 (W.D.Va. 1990).[5]

---

[5] *Clark* arose out of the strike involved in the present appeals and also concerned coercive, civil contempt fines and the issue of their mootness. The *Clark* court refused to vacate the fines upon settlement of the underlying litigation. 752 F.Supp. at 1302.

B

■ Next, we must determine whether the subject fines are moot. The Union contends that, even if the fines are valid, the Court of Appeals correctly held that they became moot when the underlying litigation between the Company and the Union was settled. We agree with the Court of Appeals that "whether civil contempt sanctions are mooted by subsequent settlements by the private parties to the litigation is a matter of state law" and that we previously have not addressed the issue. 12 Va. App. at 132, 402 S.E.2d at 904. We do not agree with the Court of Appeals, however, in its conclusion that the settlement mooted the fines.

In reaching that conclusion, the Court of Appeals relied upon *Local 333B, United Marine Division* v. *Commonwealth*, 193 Va. 773, 71 S.E.2d 159, *cert. denied*, 344 U.S. 893 (1952), and *United Steelworkers* v. *Newport News Shipbuilding*, 220 Va. 547, 260 S.E.2d 222 (1979). 12 Va. App. at 132, 402 S.E.2d at 904-05. Neither of these cases, however, supports the Court of Appeals' conclusion.

*Local 333B* dealt exclusively with criminal contempt, and we simply affirmed the procedure of transferring the criminal contempt proceeding from the equity to the law side of the court. 193 Va. at 780, 71 S.E.2d at 164. The case did not involve coercive, civil fines, and mootness was not an issue.

In *United Steelworkers,* we held that the trial court improperly imposed unconditional, criminal sanctions in the course of a civil contempt proceeding. 220 Va. at 551, 260 S.E.2d at 225. Coercive, civil fines were not involved in the case, and the court was not presented with a mootness issue.

■ Courts of the Commonwealth must have the authority to enforce their orders by employing coercive, civil sanctions if the dignity of the law and public respect for the judiciary are to be maintained. If we were to adopt the Union's mootness contention, any organization which faced coercive, contempt fines would know that, in order to completely avoid payment of the fines, it only had to postpone actual collection of the fines until the settlement of the underlying litigation.

Thus, we hold that the fines in question are not moot. While the mootness issue is governed by state law, our resolution of the issue is consistent with federal decisions. *See, e.g., United States* v.

*Criden*, 633 F.2d 346 (3d Cir.), *cert. denied*, 449 U.S. 1113 (1980); *United States* v. *Work Wear Corp.*, 602 F.2d 110 (6th Cir. 1979).

Nor is our holding inconsistent with *Gompers*, which is relied upon by the Union and which is distinguishable. In *Gompers*, the defendants were found to have violated an injunction that prohibited, among other things, the continuation of a boycott against the complainant company. 221 U.S. at 419. The complainant company sought such "relief as the nature of its case may require," *id.* at 423, whereupon the court improperly sentenced the defendants to jail terms, *id.* at 425. The company then moved for " 'its costs against the defendants under the proceedings in contempt against them,' " which motion the trial court granted. *Id.* While an appeal of the criminal sanctions and compensatory, civil sanctions was pending in the Supreme Court, the parties settled their dispute. *Id.* at 427. The Supreme Court set aside the criminal sanctions and ruled that the settlement of the underlying dispute mooted the company's claim for compensatory, civil relief. *Id.* at 451-52.

In *Gompers*, unlike in the present case, the only relief sought was compensatory relief to be paid to the complainant company, which had settled its case. *Gompers* did not involve coercive, civil contempt sanctions.

## V

The Union further contends that the subject fines are so excessive that they violate substantive due process and federal labor policy. The Union relies primarily upon *Pacific Mut. Life Ins. Co.* v. *Haslip*, 499 U.S. ___, 111 S.Ct. 1032 (1991), and *Browning-Ferris Industries* v. *Kelco Disposal, Inc.*, 492 U.S. 257 (1989), in support of its due process contention. These cases, however, deal with the issue of punitive damages and have nothing to do with coercive, civil fines imposed for contempt of court.

Likewise, the cases cited by the Union to support its federal-labor-policy contention, *United Mine Workers* v. *Gibbs*, 383 U.S. 715 (1966), and *Farmer* v. *United Brotherhood of Carpenters*, 430 U.S. 290 (1977), do not address the imposition of coercive, civil contempt fines. Additionally, it is firmly established that federal labor relations statutes do not preclude a state from exercising its powers to maintain law and order during a strike. *Lodge 76, Etc.* v. *Wisconsin Employment Rel. Comm'n*, 427 U.S. 132, 136 (1976);

*Local No. 1111, Etc.* v. *Wisconsin E. R. Board*, 315 U.S. 740, 748-49 (1942).

█ Admittedly, the fines in the present case are large. However, considering the Union's vast financial resources and the magnitude of the injunction violations, we cannot say that they are excessive as a matter of law. As previously noted, the imposition of fines was the only device available to the trial court to coerce the Union into compliance with the court's injunction. Notwithstanding the large fines, the Union never represented to the court that it regretted or intended to cease its lawless actions. To the contrary, its utter defiance of the rule of law continued unabated. Indeed, the record discloses that the Union committed more than 500 separate violations of the trial court's injunction.

## VI

Finally, the Union contends that the trial judge erred in refusing to recuse himself. (Record No. 920299). The Union based its recusal motion on two incidents: (1) the defeat of the judge's father's bid for reelection to the Virginia House of Delegates by a Union official, and (2) an alleged confrontation between the judge's father and a Union member that resulted in a criminal misdemeanor charge having been lodged against the father.

When these incidents occurred, the trial court's injunction had been in effect for more than six months. Also, several contempt hearings had been conducted, and a number of contempt orders imposing large fines had been entered well in advance of the Union's motion for recusal.

█ Whether a judge should recuse himself in a given case is a matter resting within the exercise of his reasonable discretion. *Deahl* v. *Winchester Dept. Soc. Serv.*, 224 Va. 664, 672-73, 299 S.E.2d 863, 867 (1983). On appeal, the judge's decision in the matter will not be reversed absent a showing that the judge abused his discretion. *Stockton* v. *Commonwealth*, 227 Va. 124, 141, 314 S.E.2d 371, 382, *cert. denied*, 469 U.S. 873 (1984). In the circumstances of this case, we cannot say the judge abused his discretion. Indeed, the record suggests that he properly denied the recusal motion.

█ The judge made clear his opinion that the events involving his father had no effect upon his ability to remain impartial in the case. The judge characterized the election contest as being ''exactly

the type of peaceful action that [the] Union and all members of our society ought to take advantage of.'' The judge further opined that he much would prefer that ''any particular politician be ousted from office, *including any relative of [his]*, than to have one more rock thrown at another person whereby [that person's] safety is put in peril.'' (Emphasis added.) The judge also correctly noted that the critical decisions were made by him long before the recusal motion was filed.

Therefore, we reject the Union's contention. In doing so, we conclude that a fair reading of the record clearly shows that the trial judge demonstrated a high degree of fairness, patience, and even-handedness in presiding over this complex and protracted case.

## VII

In conclusion, we hold that (1) the Court of Appeals erred in refusing to allow Bagwell to intervene; (2) the fines in question are valid, coercive, civil contempt fines imposed pursuant to an established, prospective fine schedule; (3) the subject fines were not mooted by the parties' settlement of the underlying strike and litigation; (4) the fines are not excessive in violation of substantive due process or federal labor policy; and (5) the trial judge did not err in refusing to recuse himself.

Accordingly, we will allow Bagwell to intervene as a party, we will reverse the Court of Appeals' judgment and enter final judgment in favor of Bagwell in Record No. 910634, and we will affirm the trial court's judgment in Record No. 920299.

Record No. 910634 - *Reversed and final judgment.*
Record No. 920299 - *Affirmed.*