**RAMAR COAL COMPANY, INC., Plaintiff,**

**v.**

**INTERNATIONAL UNION, UNITED MINE WORKERS OF AMERICA, et al., Defendants.**

**SHENANDOAH COAL COMPANY, INC., Plaintiff,**

**v.**

**INTERNATIONAL UNION, UNITED MINE WORKERS OF AMERICA, et al., Defendants.**

**Civ. A. Nos. 89–0176–A, 89–0177–A.**

United States District Court, W.D. Virginia, Abingdon Division.

Feb. 12, 1993.

Mark M. Lawson, Kurt J. Pomrenke, Steve Minor, White, Elliott & Bundy, Bristol, VA, for plaintiff.

James J. Vergara, Jr., Hopewell, VA, Christy Hoffman, United Mine Workers of America, Washington, DC, for defendants.

## MEMORANDUM OPINION

WILSON, District Judge.

These are consolidated civil actions by a coal mining company, Shenandoah Coal Company, Inc. ("Shenandoah"), and a coal processing company, Ramar Coal Company, Inc. ("Ramar"), against the International Union, United Mine Workers of America ("UMWA"), District 28 of the UMWA ("District 28"), and their respective locals, Local 7327 and Local 1852, for damages arising from a secondary boycott in violation of section 303 of the Labor Management Relations Act ("LMRA"), as amended, 29 U.S.C. § 187, and an unlawful conspiracy in violation of state law. The actions were tried before a jury, which concluded that defendants had engaged in an unlawful secondary boycott and had conspired to damage and, in fact, damaged Shenandoah and Ramar by non-peaceful acts.[1] The jury found that Shenandoah sustained $749,000 in damages and that Ramar sustained $756,000 in damages. The matter is before the Court on numerous motions for judgment as a matter of law. Although the Court finds no basis for setting aside the jury's liability findings, the Court concludes that the jury's awards were excessive and contrary to the clear weight of the

---

1. Liability was tried first.

evidence, sets aside those awards, and orders a new trial on damages.

## I. FACTS

Shenandoah mined coal from a seam of coal known as the "jawbone seam" located in the Jewell Valley of Buchanan County, Virginia and delivered it to a nearby preparation plant operated by Ramar, a company closely aligned with Shenandoah by common ownership and management. Jewell Ridge Mining Corporation ("Jewell Ridge"), a subsidiary of the Pittston Company ("Pittston"), leased the mine to Shenandoah and the preparation plant to Ramar. Previously Jewell Ridge operated each as a union shop. These cases arose during an acrimonious labor dispute between Pittston and the UMWA following the expiration of the National Bituminous Coal Wage Agreement of 1984 ("NBCWA"). UMWA struck Pittston on April 5, 1989. The strike lasted until February 1990 and was marred by violence and disobedience of court orders.[2]

### A. Shenandoah

Shenandoah was incorporated on March 11, 1987. James Ashby was its sole shareholder and president.[3] On April 1, 1988, Shenandoah entered into a contract mining agreement with Jewell Ridge. The agreement called for Shenandoah to mine the "jawbone seam" and to deliver coal to a preparation plant commonly known as the "No. 18 Preparation Plant," which was to be operated by Ramar. Ashby signed the agreement as Shenandoah's president. On April 27, while only a few employees were working to prepare the mine for production, Ashby signed an agreement on behalf of Shenandoah with the Southwest Virginia Coal Miners Union ("SVCMU"). On January 3, 1989, District 28 representative, Donnie Lowe, requested collective bargaining agreement negotiations with Shenandoah. Ashby responded that Shenandoah's employees were represented by SVCMU. Two weeks later, Rick Jackson, Shenandoah's manager, shut down one of two mine shafts for low production and laid off several UMWA supporters.

On April 5 UMWA struck Pittston. That same morning Shenandoah's employees "walked-off" the work site, telling Rick Jackson that a strike had been called. At trial Jackson testified that, as he followed the men to talk about the strike, "the pickets were already starting to form down at the mine entrance," and the picketers were carrying signs protesting Pittston's unfair labor practices. The next day 20 to 25 picketers arrived carrying signs complaining about Pittston. Shenandoah filed unfair labor practice charges with the NLRB claiming the work stoppage was an unlawful secondary boycott.

On April 18, 1989, UMWA and District 28 filed unfair labor practice charges against Shenandoah.[4] Two days later Donnie Lowe wrote James Ashby informing him that Shenandoah's employees "walked out on strike" because of Shenandoah's "unlawful scheme to implement a 'company union'" (the SVCMU) and to "secure recognition of the UMWA as their collective bargaining agent." According to the letter, UMWA agreed "after the walkout had begun to lend their support." The letter emphasized that Shenandoah was being struck over "a primary dispute with Shenandoah," not because of UMWA's dispute with Pittston. The letter concluded that UMWA had asked the pickets to withdraw temporarily from the Shenandoah work site to guard against an "erroneous picket line message."

UMWA picketers and their supporters wore camouflage fatigues to show "solidari-

---

2. See *Bagwell v. International Union, UMWA*, 244 Va. 463, 423 S.E.2d 349 (1992).

3. On May 11, 1989, Ashby filed an affidavit in the Circuit Court of Buchanan County in an action brought by Shenandoah against District 28. He sought to enjoin acts of violence arising from the Pittston strike. Ashby stated in the affidavit that he was then "Shenandoah's sole shareholder and president." He testified at the trial in this case, however, that he sold all the shares to Rick Jackson in January 1989. The Court finds Ashby's testimony disingenuous.

4. On January 8, 1992, the National Labor Relations Board ("NLRB") adopted an administrative law judge's decision finding that Shenandoah had engaged in unfair labor practices and ordering remedial action. *Shenandoah Coal Co.*, 305 N.L.R.B. No. 166, 1991–1992 NLRB Dec. (CCH) § 17,049 (Jan. 8, 1992).

ty" during the Pittston strike and congregated at entrances to other struck companies along the road between Ramar and Shenandoah. Independent contractors hauling Shenandoah's coal along that road were intentionally damaged. Coal truck tires were flattened by jack-rocks, windows were smashed, and drivers were threatened. At times, disabled coal trucks jammed the road, shutting off the flow of coal. According to Jackson, production completely halted for a period because most of the drivers were afraid to cross the picket line and because the electricians he was required by law to employ were also on strike. The picketers left Shenandoah in February 1990 when the Pittston strike ended, but returned several weeks later. The company remains on strike, and the picketing continues.

### B. Ramar

Ashby was also the president and sole shareholder of Ramar. On April 1, 1988, the date of Shenandoah's contract mining agreement with Jewell Ridge, Ashby entered into an agreement with Jewell Ridge to operate the No. 18 Preparation Plant. Under the agreement, Ramar was to "maintain the capability of cleaning and processing up to a maximum of 3,600 tons of raw coal per day." Jewell Ridge was to lease all equipment to Ramar, and Ramar's employees were to perform all necessary work, although Jewell Ridge kept several employees on site to monitor the weighing of coal and for laboratory operations.

Jewell Ridge previously operated the facility as a union shop under the NBCWA, which expired on January 31, 1988. After taking control of operations at the plant, Ashby entered into negotiations with UMWA. According to Ramar's agreement with Jewell Ridge, Ramar agreed to be "a successor to any and all obligations of [Jewell Ridge] under the expired National Bituminous Coal Wage Agreement of 1984" and "to hire from the panel" in accordance with the terms of that expired agreement.[5] Ramar hired from the panel but refused to pay wages and

benefits called for under the expired NBCWA. The parties bargained to impasse. On April 4, 1989, UMWA filed an unfair labor practice charge.[6]

On that same date, Henry Shortridge, the acting president of District 28, sent a memorandum to Eddie Bowling, the selective strike coordinator for UMWA, listing "companies to be put on selective strike benefits at Jewell Ridge." The memorandum also listed "Jewell Ridge lease mines" that were to be selectively struck, including the Ramar plant. That same day UMWA President Richard Trumka notified Ramar that UMWA was calling a selective strike over UMWA's labor dispute with Ramar "in protest of its unfair labor practices." The strike was to begin with the afternoon shift on April 5, 1989.

The next afternoon the employees "walked off," and picketing began at the entrance to the plant. Several days later signs protesting Pittston's and Ramar's "unfair labor practices" began to appear at the site. One sign at the entrance of Ramar's plant read, "Ramar on strike due to Pittston unfair labor practices." On April 20, however, the same date District 28 representative Donnie Lowe sent Ashby the letter disclaiming any secondary motivation in the strike at Shenandoah, he sent Ashby a similar letter concerning the strike at Ramar. According to that letter, UMWA struck Ramar "over Ramar's unfair labor practices which [were] the subject of a pending charge with the NLRB" and over Ramar's failure to "conclude a collective bargaining agreement."

At trial Ashby testified that, at the beginning of the strike, the picketing, coupled with the violence, almost completely stopped production. Ashby also was threatened, his windshield was smashed, and his tires were flattened by jack-rocks.

## II. LIABILITY

Defendants moved for judgment as a matter of law or, in the alternative, for a new trial. They contend that the claim under

---

**5.** *See International Union, UMWA v. Ramar Coal Co.*, Civil Action No. 90–0088–A (W.D.Va.1992).

**6.** *See Ramar Coal Co.*, 303 N.L.R.B. No. 95, 1991–1992 NLRB Dec. (CCH) ¶ 16,737 (June 28, 1991).

section 303 of the LMRA fails as a matter of law because the strike was a lawful primary strike and because Ramar and Shenandoah were not neutrals. They further contend that the state law conspiracy claim must fail because there is not clear and convincing evidence of union complicity in nonpeaceful acts; because defendants are incapable of conspiring with each other; and because the action is barred by *res judicata* and collateral estoppel. Each of these contentions is considered in turn.

## A. Secondary Boycott

### i. Primary versus secondary

The jury found that Shenandoah and Ramar proved the strikes were motivated in whole or in part by the desire to advance defendants' interests in their dispute with Pittston and that defendants failed to prove that Shenandoah and Ramar would have been struck without that secondary motivation. Defendants maintain that there is insufficient evidence to support the jury's findings. The Court disagrees for several reasons.

First, according to the evidence, Henry Bowling, acting District 28 president, made the initial decision to strike Ramar. Bowling communicated that decision to UMWA by a memorandum listing "Jewell Ridge lease mines" that were to be selectively struck, and Trumka followed Bowling's decision. In context, the jury could have viewed the memorandum as circumstantial evidence that Ramar was selectively struck because it was a Jewell Ridge contractor, not because of a primary dispute between Ramar and its employees. Second, the jury could have viewed in context the timing of the Ramar and Shen-

andoah strikes, an equivocal fact standing alone, as further evidence of secondary motivation. Third, the early secondary pickets proclaimed that Shenandoah and Ramar were on strike due to Pittston's unfair labor practices. Despite defendants' self-proclaimed contrary intention, the jury could have viewed the pickets' message not as an isolated and unauthorized message, but rather as the central message the defendants intended to convey. Fourth, when the Pittston strike ended, the picketers left Shenandoah for several weeks, although the Shenandoah strike later continued. Thus, the secondary boycott issue was properly submitted to the jury, and the jury's decision should not be set aside.

### ii. Neutrality

■ The jury also found that defendants failed to prove that Shenandoah and Ramar were not neutrals in UMWA's strike against Pittston.[7] Defendants contend that Shenandoah and Ramar were not neutral as a matter of law because of Pittston's alleged control over their operations. The Court finds that contention meritless.

> [I]t is ordinarily a fact issue for resolution by the jury whether the independent employer is to be considered an "ally" of the primary employer. Only if the facts are so compelling one way or the other that it can be said that as a matter of law the independent employer is or is not a secondary employer does the issue become one of law.

*Kinty v. United Mine Workers*, 544 F.2d 706, 718 (4th Cir.1976), *cert. denied*, 429 U.S. 1093, 97 S.Ct. 1107, 51 L.Ed.2d 540 (1977). Ramar's and Shenandoah's corporate identi-

---

**7.** The court gave the following "neutrality instruction" proposed by UMWA:

The laws against secondary boycotts protect only "genuinely neutral" employers. Therefore, if the plaintiffs were allied with Pittston such that they were not neutrals in Pittston's dispute with the Mine Workers, any strike against them would be lawful, even if the strike was directed at Pittston.

In order to determine whether Ramar and Shenandoah were neutrals as to Pittston, you should consider the four following factors:

  1. Interrelation of Operations;
  2. Common Management;
  3. Centralized Control of Labor Relations; and
  4. Common Ownership or Financial Control.

No one factor is controlling or decisive, nor do all four have to exist. Your decision in this regard should be based on all of the facts and circumstances.

You may also find that Ramar and Shenandoah were not neutrals if you find that they were performing "struck work," that is work which would have been performed by Pittston's unionized employees except for the strike.

ties were distinct from Pittston's and Jewell Ridge's; Ramar and Shenandoah directed the workers' activities at their respective job sites with limited exceptions; and although Ramar assumed successorship obligations under its contract with Jewell Ridge, there is no evidence of a common labor policy. Simply put, these facts are hardly so compelling as to make the issue one of law.

### B. Conspiracy

#### i. Clear and convincing evidence—"nonpeaceful" acts

▪ The jury also found violations of Virginia's civil conspiracy statutes, Code of Virginia sections 18.2–499 and 18.2–500.[8] The jury found that Shenandoah and Ramar proved by clear and convincing evidence that a conspiracy existed to injure them by "nonpeaceful" acts, that each defendant joined in the conspiracy, and that Shenandoah and Ramar were, in fact, injured by "nonpeaceful" acts committed in furtherance of that conspiracy.[9] Defendants contend that no evidence supports those findings. Again, the court disagrees. Although there is no direct evidence of union complicity in the violence, there is sufficient circumstantial evidence for the jury's conclusion. The strike was long and the lawlessness pervasive. Union officials were regularly on the scene. Yet, the only evidence of any efforts to curb the violence came from Donnie Lowe, District 28 field representative, who testified that he would talk to the men that were "upset" and, if necessary, "assign them other duties away from the picket line." There was no evi-

dence that any member of the union was disciplined, or that there was any serious, comprehensive effort to stop the violence.[10]

Section 6 of the Norris–LaGuardia Act, 29 U.S.C. § 106 provides:

> No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof.

As stated by the Supreme Court, "[T]he driving force behind § 6 ... was the fear that unions might be destroyed if they could be held liable for damage done for acts beyond their practical control." *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 737, 86 S.Ct. 1130, 1144, 16 L.Ed.2d 218 (1966). Thus, clear proof of complicity—in this case ratification—is required. Although the "clear proof" standard is less than the criminal standard of reasonable doubt, it is more than a preponderance of the evidence. *Gibbs*, 383 U.S. at 736, 86 S.Ct. at 1144. Clear proof of ratification requires proof of active participation or knowing tolerance:

> Preliminarily, we note that it would be inconsistent with the fabric of national labor policy to infer ratification from the mere fact that petitioner involved itself in the dispute after the violence had occurred, or from the fact that it carried on

---

8. Section 18.2–499 of the Code of Virginia, in pertinent part, makes it unlawful to conspire maliciously to injure another in his business. VA.CODE ANN. § 18.2–499 (Michie 1988). Section 18.2–500 creates a civil remedy for violations of § 18.2–499, including treble damages. VA.CODE ANN. § 18.2–500 (Michie 1988).

9. Consistent with the preemption doctrine the jury was given a special interrogatory which "focus[ed] the jury's attention upon violence or threats of violence as the essential predicate of any recovery it might award" for violation of Virginia's conspiracy statutes. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 735, 86 S.Ct. 1130, 1143, 16 L.Ed.2d 218 (1966). The jury was also instructed in part:

> The law does not hold a labor organization responsible for the unsanctioned acts of its

individual members. Unions may be held responsible only for the authorized or ratified actions of their officers and agents. Even if union members engaged in nonpeaceful activities, unless there is clear proof that those activities were expressly authorized or ratified after actual knowledge by the union that the activities occurred, the union may not be held liable.

10. Shenandoah and Ramar point to the existence of a striker support fund, "Justice for Pittston Miners", as evidence that the union supported violence during the strike. Although the fund paid some fines and bail for striking miners, and some union officials supported the fund, evidence concerning the fund and its role in the strike remain ambiguous. Those matters were not clearly proven.

some normal union functions, such as provision of strike relief. A union would ordinarily undertake these tasks during the course of a lawful strike. National labor policy requires that national unions be encouraged to exercise a restraining influence on explosive strike situations; and when they seek to do so, they should not for these activities be made to risk liability for such harm as may already have been done. The fact that ripples of the earlier violence may still be felt should not be permitted, and under § 6 is not permitted, to impose such liability. Because the dispute which sparked the violence will often continue, the union will feel a responsibility to take up the dispute as well as to curb its excesses. There can be no rigid requirement that a union affirmatively disavow such unlawful acts as may previously have occurred. [Citation omitted.] What is required is proof, either that the union approved the violence which occurred, or that it participated actively or by knowing tolerance in further acts which were in themselves actionable under state law or intentionally drew upon the previous violence for their force.

*Id.* at 738–39, 86 S.Ct. at 1145–46.

Applying these principles in *Gibbs*, the Supreme Court found a lack of "clear proof" supporting a verdict against UMWA under a state conspiracy statute:

> The record here is persuasive that the petitioner did what it could to stop or curtail the violence. There was repeated and uncontradicted testimony that when news of the violence reached the meeting that [the union official] was attending, he

was given firm instructions to return to the scene, to assume control of the strike, to suppress violence, to limit the size of the picket line, and to assure that no other area mines were affected. He succeeded. Although the day after his return two Consolidated officers were harassed by a large and unruly mob in a nearby town, this incident was unrelated to respondent, and was not repeated.

*Id.* at 739–40, 86 S.Ct. at 1146.

█ In contrast to *Gibbs*, the jury could have concluded from the evidence that defendants did not do what they could to stop or curtail the violence. There is no evidence that firm instructions were given to go to the scene and assume control of the strike, to suppress violence, to limit the size of picket lines, or to prevent spill-over from one strike to the next.[11]

ii. Legal impossibility

█ In attacking the jury's verdict, defendants have asserted for the first time that they are legally incapable of conspiring. According to defendants, under the intracorporate immunity doctrine enunciated by the Supreme Court in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), which has been applied to actions under section 18.2–500 of the Code of Virginia, District 28 and the locals are "subsidiaries" of the UMWA and, as such, are incapable of conspiring with each other.[12] Because defendants' motion for judgment as a matter of law on this ground was raised for the first time after the return of the jury's verdict, it will be denied.

---

11. Defendants also argue that there is no evidence of a "mutual agreement," a necessary element of conspiracy. The court finds to the contrary, in essence, for the reasons stated above. Defendants called for or adopted the strikes as their own; they *agreed* to the strikes. When the character of those strikes became lawless, defendants were obligated to take steps to curb the strikes' lawless character. Although § 6 of the Norris–LaGuardia Act, 29 U.S.C. § 106, precludes liability if defendants had made serious efforts to control violence but failed defendants may be held liable for failing to make a serious, good faith, effort. When they fail to make such an effort, the nature of their agreement can be inferred from the character of the strike.

12. The *Copperweld* Court specifically limited its "inquiry to the narrow issue squarely presented: whether a parent and its wholly owned subsidiary are capable of conspiring in violation of § 1 of the Sherman Act." 467 U.S. at 767, 104 S.Ct. at 2739. Although the Court does not decide whether *Copperweld* reasoning can or should be applied to unincorporated associations, the Court can find no reason why defendants, *as one entity*, could not have conspired with individuals on the picket lines who were engaging in "nonpeaceful acts."

Courts have consistently viewed a post-verdict motion under Fed.R.Civ.P. 50(b) as the renewal of a motion made at the close of the evidence:

> Since the motion under subsection (b) of Rule 50 is considered to be a renewal of the motion under subsection (a), it follows that a motion for judgment as a matter of law made after the verdict cannot be entertained unless the moving party requested judgment as a matter of law prior to the submission of the case to the jury by moving for such a judgment at the close of all the evidence.
>
> ... However, a party that moved for judgment as a matter of law at the close of all the evidence has not necessarily completely preserved its right to move for judgment after the verdict under Rule 50(b). This is so because the latter motion may only be premised upon particular grounds raised in the earlier motion made at the close of all the evidence. Therefore, any argument omitted from the motion made at the close of all the evidence is waived as a ground for judgment under Rule 50(b).

5A JAMES W. MOORE et al., MOORE'S FEDERAL PRACTICE ¶ 50.08 (2d ed. 1985). Accordingly, defendants motion for judgment as a matter of law on the ground of legal impossibility will be denied because it was not made before the jury's verdict and because the Court finds no applicable exception to waiver. *See Smith v. University of North Carolina*, 632 F.2d 316, 338–39 (4th Cir.1980).

iii. *Res judicata* and collateral estoppel

■ At the beginning of the strike, Shenandoah and Ramar each filed a bill of complaint in the Circuit Court of Buchanan County seeking to enjoin District 28 and UMWA from violating section 40.1–53 of the Code of Virginia. That section provides in part:

> No person shall engage in picketing by force or violence, or picket alone or in concert with others in such manner as to obstruct or interfere with free ingress or egress to and from any premises, or obstruct or interfere with free use of public streets, sidewalks or other public ways.

VA.CODE § 40.1–53 (Michie 1990). The circuit court enjoined District 28 and UMWA, ultimately held them in contempt, and fined them because the court found "clear and convincing evidence [of] numerous and repeated violations" of its injunctions. The Virginia Court of Appeals reversed the circuit court because it concluded that the fines were "criminal fines," which could have been imposed only upon a finding of guilt beyond a reasonable doubt. In the trial of this case, defendants moved to amend their answers to plead *res judicata* and collateral estoppel because of the injunction proceedings in Buchanan County. The Court permitted the amendments but found that the actions were not barred. Defendants have renewed their motions. The Court again finds those motions meritless.

In Virginia, "a chancery suit is not *res judicata* to a subsequent law action unless the very matter in controversy in the pending action was decided in the prior suit." *Wright v. Castles*, 232 Va. 218, 349 S.E.2d 125, 128 (1986). It is readily apparent that an action to enjoin conduct that is unlawful under section 40.1–53 of the Code of Virginia lacks the kind of substantial legal identity with an action under section 18.2–500 required for the application of *res judicata.* An action under section 40.1–53 seeks to prohibit discreet physical acts such as the blocking of a roadway. The remedy is prospective in nature. In contrast, an action under section 18.2–500 seeks compensation for completed actions taken specifically for the purpose of injuring a business. The former seeks to prevent damage, and the latter seeks to recover if damage occurs. Accordingly, this action is barred neither by *res judicata* nor by collateral estoppel.[13]

---

13. According to the Virginia Supreme Court:

> For *res judicata* purposes, four elements must concur: (1) identity of the remedies sought; (2) identity of the cause of action; (3) identity of the parties; and (4) identity of the quality of the persons for or against whom the claim is made.

*Wright*, 349 S.E.2d at 128. Obviously, in the present case, the remedies sought and the causes of action differ from those in the prior state proceedings.

## III. DAMAGES

■ The Court is required to set aside an excessive verdict even if the verdict is supported by substantial evidence if the Court believes "the verdict is against the clear weight of the evidence, or is based upon evidence which is false, or which would result in a miscarriage of justice." *Aetna Casualty & Surety Co. v. Yeatts*, 122 F.2d 350 (4th Cir.1941); *accord Johnson v. Parrish*, 827 F.2d 988 (4th Cir.1987). Defendants contend that the damage awards are excessive, entitling them to a new trial on all questions. The Court finds the awards excessive, but concludes that a new trial on damages is sufficient to remedy any injustice.

The Pittston strike began in April 1989 and ended in February 1990. Shenandoah and Ramar proved lost profits as their only element of damage. The Court found at trial that lost profits occurring after the Pittston strike were too remote and could not be recovered. Thus, the jury was required to determine lost profits for a period of approximately eleven months. Experts testified for each side. Their calculations varied widely. Shenandoah's and Ramar's expert, who was also their bookkeeper and accountant, calculated the average monthly profit for each company for the first three months of 1989— approximately $30,000. That average monthly profit was then projected for each month of the strike. Under this methodology each company would have had a total projected profit of roughly $330,000. The difference between the total projected profit and the actual profit was then claimed as the lost profit.[14] Using this methodology, each would have sustained losses well below $330,000. Yet, the jury found that Shenandoah sustained $749,000 in damages and Ramar $756,000.

Defendants' expert based his projections on lost profits per ton. According to his calculations, Shenandoah had lost profits of approximately $45,000 and Ramar approximately $48,000. The Court finds him credible and his calculations more reliable than the calculations of Shenandoah's and Ramar's expert. Although the Court would not necessarily order a new trial on that ground alone, the Court is satisfied that a miscarriage of justice would occur if the verdicts were not set aside, in light of their excessiveness under Shenandoah's and Ramar's own calculations.

■ Defendants assert that they are entitled to a new trial on all issues because the jury did not fairly consider the issue of damages. Although the Court is convinced that the jury was mistaken as to damages, the Court finds nothing to suggest that the jury's verdict was based on anything other than honest judgment. The Court also finds that issues of liability and damages are not so inextricably intertwined as to make a partial new trial unfair. According to the court of appeals, if a court concludes "that the first verdict was based on honest judgment by well-intentioned jury, and that the liability and damage issues were not inextricably intertwined, so that a partial new trial [is] fair to both parties," the court is permitted to order a partial new trial. *Great Coastal Express, Inc. v. International Bhd. of Teamsters*, 511 F.2d 839, 847 (4th Cir.1975), *cert. denied*, 425 U.S. 975, 96 S.Ct. 2176, 48 L.Ed.2d 799 (1976).

## IV. CONCLUSION

For the reasons stated above, the jury's resolution of issues governing liability will not be set aside. Defendants' motion for a new trial will be granted on the issue of damages.

---

**14.** Some highly questionable expenses were factored in the calculation of actual profits for 1989. Ramar, for example, claimed exploration expenses in 1989 of more than $39,000. Those expenses appeared to be nothing more than Ashby's traveling expenses.