PRESENT:  All the Justices

KATIE ORNDOFF

v.  Record No. 240394

COMMONWEALTH OF VIRGINIA

OPINION BY
JUSTICE STEPHEN R. McCULLOUGH
SEPTEMBER 25, 2025

FROM THE COURT OF APPEALS OF VIRGINIA

Katie Orndoff testified at a criminal jury trial in the Circuit Court for Loudoun County as a witness for the Commonwealth.  The circuit court held Orndoff in summary criminal contempt pursuant to Code § 18.2-456 for "[m]isbehavior in the presence of the court" on the basis that she was intoxicated.  The circuit court sentenced Orndoff to ten days in jail.  On appeal, among other issues, Orndoff challenges the sufficiency of the evidence supporting her summary contempt conviction.  For the following reasons, we reverse the judgment of the Court of Appeals, which affirmed the circuit court judgment en banc by an equally divided court, without opinion, pursuant to Code § 17.1-402(E).

I.  MATERIAL FACTS AND PROCEEDINGS

A.  Circuit Court Proceedings

On September 7, 2021, Orndoff testified for the Commonwealth as the complaining witness in the jury trial of James Paige Phillips, who was indicted for felony domestic assault and battery of a family or household member, third or subsequent offense.

During direct examination, in establishing the relationship between Phillips and Orndoff, the purported victim of the felony domestic assault and battery charge, Orndoff was asked about the financial relationship between them and about their cohabitation.  In response to a question about their sharing of financial responsibilities, Orndoff stated, without objection, that she had bailed Phillips out of jail once.  She was subsequently asked whether Phillips resided in her

apartment with her, and she testified that Phillips resided with her "until he got arrested." (Tr. Vol. 2, 265-66). At that point, defense counsel objected to Orndoff's testimony, noting that the parties agreed not to introduce information pertaining to Phillips' arrest and incarceration history. The circuit court sustained the objection and instructed the jury to disregard Orndoff's statement. Later, when she was again asked about their sharing of financial responsibilities, Orndoff repeated that she paid Phillips' bail bond. This time, defense counsel objected and asked the circuit court to direct Orndoff to follow the parties' agreement.

In response, the circuit court inquired "does the witness know what you agreed to?" The following exchange occurred:

> Ms. Ventura: We had a conversation, Judge, about the parameters of – and I don't know how much we should be talking about this in front of the jury, but –
>
> The Court: Well, let's just do this: Ma'am, just answer the questions as asked, but don't reference things like arrest, unless that's a specific question, all right?
>
> The Witness: Okay.

R. 50-51.

When asked on cross examination to confirm if she had met with Phillips to "hang out and hook up," Orndoff replied that Phillips was with her "24/7 when he wasn't incarcerated." (Tr. vol. 2, 316). Defense counsel requested the circuit court to admonish Orndoff regarding her response; the circuit court directed Orndoff to "listen to the question and answer it as asked." (*Id.*).

During subsequent cross-examination, in response to the question "do you recall telling him, on July 14th, that you hoped that incarcerated time will make him think about everything that he has done and the person" that he is, Orndoff stated that Phillips "got out of a felony abduction—like back in January," prompting defense counsel to object and to request a sidebar.

2

After the jury left the courtroom, the circuit court remarked that Orndoff appeared to be under the influence of narcotics or another type of substance. The circuit court asked Orndoff if she had taken anything that could impair her. Orndoff responded that she had recently stopped taking her antidepressant and mood stabilizer medication and it was affecting her. She explained that she had been taking these medications for over ten years and that without them, she felt very stressed and anxious "with this whole situation." (Tr. vol. 2, 345).

The circuit court told Orndoff that she had not responded to its question and that she appeared to be under the influence, asserting that Orndoff "just rocked in [her] chair, and almost fell over." (Tr. vol. 2, 346). When the circuit court asked what she had taken that day, she admitted to smoking marijuana that morning before driving to court. The circuit court held Orndoff in summary contempt, sentencing her to ten days in jail and remanding her to the sheriff's custody.

Following a recess, the Commonwealth asked the circuit court to reconsider its contempt finding and proffered that two detectives would testify that Orndoff's behavior in the courtroom was consistent with her usual demeanor. The Commonwealth also requested appointment of counsel for Orndoff. The circuit court denied both requests, citing Orndoff's in-court admission to smoking marijuana before testifying and holding that Orndoff was not entitled to counsel in a summary contempt proceeding.

Defense counsel then moved to dismiss the charge against Phillips. The circuit court declined the motion but declared a mistrial. The Commonwealth argued it should be allowed to rehabilitate Orndoff as a witness because she indicated she smoked marijuana, which was not an illegal substance. The Commonwealth further argued that Orndoff's unusual behaviors were typical of Orndoff. The circuit court stated in response:

> I disagree. As I stated on the record, the witness was incoherent. Her body language was such [that] she was rocking forward in her chair, rocking back. When I asked her a question, she almost tipped her chair over. She clearly manifested signs of intoxication and she admitted to smoking marijuana prior to driving over here. Whether it's legal or not has no bearing on this. If she admitted to drinking a fifth of Jack Daniel's and came to court and voluntarily testified drunk, that would be contemptible as well.

(Tr. vol. 2, 353-54). The circuit court repeated that it was declaring a mistrial over the objections of both defense counsel and the Commonwealth. The circuit court informed the jury that Orndoff had been found in contempt and a mistrial declared based on the court's "judgment about her appearance" and her admission to testifying after consuming an intoxicating substance.

That same day, the circuit court issued a commitment order recording its finding of contempt and imposing a ten-day sentence pursuant to Code § 18.2-456(A)(1). The commitment order described Orndoff's misbehavior as: "appear[ing] and testify[ing] while voluntarily intoxicated." (*Id.*). The order directed that Orndoff be taken to the emergency room for a blood draw to test for narcotics, with the results to be filed with the circuit court clerk.

On September 8, 2021, the circuit court issued an order recording its factual findings and judgment. The order reiterated that Orndoff appeared to be "under the influence of narcotics or another substance," and "was questioned by the [c]ourt about her use of substances prior to appearing for [c]ourt." (*Id.*). The order stated that Orndoff admitted to smoking marijuana before coming to court and that the circuit court found Orndoff in summary contempt "for appearing before the Court and testifying while voluntarily intoxicated." (*Id.*).

B. Post Conviction Motions and Orders

On September 9, 2021, Orndoff filed a notice of appeal to the Court of Appeals, and the circuit court granted her motion for bond pending appeal. At the bond hearing, the circuit court summarized the rationale for its summary contempt finding, citing Orndoff's apparent

4

intoxication during her testimony, erratic physical behavior, and her admission to using marijuana shortly before arriving at court.

Orndoff moved to vacate the contempt judgment, and the Commonwealth filed a brief supporting the motion. The day before a hearing scheduled on the joint motion to vacate, the circuit court entered an order removing the hearing from the court's docket and denying the motion as "wholly without merit." (DR Man. vol. 1, 47).

On September 22, 2021, the circuit court entered a separate "nunc pro tunc" order clarifying and amending the September 7 commitment order. The nunc pro tunc order stated that Orndoff's testimony was "incoherent" and "circuitous." (*Id.*). The order noted that Orndoff arrived late for court,[1] was inattentive, and repeatedly ignored instructions not to reference Phillips' incarceration. Additionally, the order stated that Orndoff displayed unusual physical behavior, including rocking back and forth in her chair, leaning so far back that she was "almost prone," and nearly falling out of her chair. The circuit court stated that Orndoff "ultimately admit[ted] to smoking marijuana immediately prior to driving to court for the jury trial." The circuit court held Orndoff in summary contempt because she "appear[ed] and testif[ied] while voluntarily intoxicated." (DR Man. vol. 1, 51). The circuit court concluded that a witness who voluntarily consumes "sufficient quantities of intoxicating substances and testifies in an impaired state that causes [a] jury mistrial due to their behavior" was guilty of summary contempt "with the completed offense having occurred in the direct presence of the court." (DR Man. vol. 1, 52).

---

[1] The record shows that the Commonwealth originally instructed the witnesses, including Orndoff, to appear for trial at 1:00 p.m. However, when it became evident that the jury would be empaneled earlier, the Commonwealth's Attorney stated she would direct the witnesses to arrive by 11:00 a.m. Despite this, Orndoff was not present after opening statements, prompting the Commonwealth to request a delay.

Orndoff objected to the nunc pro tunc order, arguing that the audio and visual recordings of the circuit court proceeding did not support the circuit court's expanded factual findings. Orndoff also filed a second motion to vacate the contempt finding and an emergency motion to suspend the order pending argument. As part of her motion, Orndoff included the circuit court's audio recording of Orndoff's testimony and the video recording of her testimony from the courtroom security camera. The circuit court stayed enforcement of the contempt order pending a final ruling.

After hearing arguments on the second motion to vacate, the circuit court restated its expanded factual findings on the record, including those contained in the nunc pro tunc order. The circuit court remarked that Orndoff "blurted out prejudicial content 10 times," which led to the removal of the jury. Although the circuit court found no "malevolent intent," it concluded that Orndoff "lacked the capacity" to follow instructions due to her "voluntary intoxication prior to court." The circuit court then took the matter under advisement.

On January 14, 2022, the circuit court denied Orndoff's second motion to vacate. The circuit court explained that Orndoff's "misbehavior" was not only the out-of-court use of intoxicants, but also her "subsequent appearance as a witness in a felony jury trial in an intoxicated condition that caused unfair prejudice within the trial." (DR Man. vol. 2, 23). The circuit court emphasized that the contempt finding did not rely on Orndoff's admission to using marijuana, as the circuit court had already concluded she was intoxicated based on its own observations. It stated that her partial admission was "largely unreliable." *Id.* The circuit court explained it had only questioned Orndoff to "clarify" the cause of her behavior. The circuit court further held that its authority to impose summary contempt was proper because the facts were evident from direct observation and did not depend "in any way, upon knowing exactly how,

6

when or where Ms. Orndoff became intoxicated, nor did it depend upon the substance(s) she ingested." (DR Man. vol. 2, 28). Finally, the circuit court granted Orndoff's earlier motion to commute her sentence to time served and released her from bond conditions.

## C. Court of Appeals Proceedings

In a published opinion, a three-judge panel of the Court of Appeals reversed the circuit court's finding of summary contempt against Orndoff. The majority held that the circuit court erred because it "did not personally observe in open court all the essential elements of the alleged contemptible conduct of testifying while voluntarily intoxicated." (CAV DR 263). Specifically, the majority explained that the circuit court failed to link Orndoff's behavior to the voluntary use of an intoxicant. The majority opinion also noted that the circuit court's finding appeared to rely in part on Orndoff's failure to comply with an out-of-court agreement not to reference the defendant's criminal record. The majority determined that the circuit court impermissibly relied on Orndoff's admission to using marijuana, rather than its own personal knowledge of that fact. The majority concluded that holding Orndoff in summary contempt under these circumstances violated Orndoff's due process rights, including her right to notice, a full hearing, and representation by counsel.

A dissenting opinion maintained that the circuit court properly exercised its authority to hold Orndoff in summary contempt because her conduct and repeated references to the defendant's incarceration occurred in open court and disrupted the trial, ultimately leading to a mistrial. The dissent emphasized that the circuit court had direct, personal knowledge of Orndoff's behavior. The dissent concluded that a rational factfinder could find Orndoff's conduct contemptuous.

7

The Commonwealth subsequently filed a petition for rehearing en banc, asserting that the panel erred in concluding that the circuit court erroneously held Orndoff in summary contempt. The Court of Appeals granted the petition, stayed the panel's mandate, and held oral argument on the matter. The judges sitting in the en banc proceedings were evenly divided concerning the resolution of the matter. Accordingly, the Court of Appeals issued a published order affirming the circuit court's judgment without opinion pursuant to Code § 17.1-402(E).

## II. ANALYSIS

Orndoff challenges the sufficiency of the evidence supporting her summary contempt conviction in the circuit court.

"[W]e review the exercise of a court's contempt power under an abuse of discretion standard." *Petrosinelli v. People for the Ethical Treatment of Animals, Inc.*, 273 Va. 700, 706 (2007). Additionally, when evaluating whether the evidence supports a contempt finding, we have held that a court's judgment when exercising its contempt power is presumed correct and will not be overturned unless it is clearly erroneous or lacks evidentiary support. *Nusbaum v. Berlin*, 273 Va. 385, 408 (2007). Although this standard is demanding, it is neither insurmountable nor meaningless. Also, "[w]hen the sufficiency of the evidence is challenged on appeal, this Court is required to view the evidence in the light most favorable to the prevailing party at trial and to accord to that party the benefit of all reasonable inferences fairly deducible from the evidence." *Id.* at 407.

### A. The Court's Contempt Powers

It has long been established that Virginia courts possess an "inherent power" to punish for contempt. S*ee, e.g.*, *Higginbotham v. Commonwealth*, 206 Va. 291, 294 (1965). This inherent authority not only ensures compliance with court orders but also upholds public

8

confidence and respect for the judiciary, both of which are essential to protecting and enforcing the rights of the people. *See Nicholas v. Commonwealth*, 186 Va. 315, 321 (1947); *Carter v. Commonwealth,* 96 Va. 791, 810 (1899).

"Although the 'power of the court to punish is the same,' there are two distinct types of contempt, direct and indirect." *Scialdone v. Commonwealth*, 279 Va. 422, 442 (2010) (quoting *Burdett v. Commonwealth*, 103 Va. 838, 846 (1904)). "[T]he substantial difference between a direct and [an indirect] contempt is one of procedure." *Burdett*, 103 Va. at 845.

"Direct contempt occurs when the contemptible conduct 'is committed in the presence of the court.'" *Scialdone*, 279 Va. at 442 (quoting *Burdett*, 103 Va. at 845-46). Because the misconduct transpires in open court and is readily observable by the judge, "the court is competent . . . to proceed upon its own knowledge of the facts, and to punish the offender without further proof, and without issue or trial in any form." *Id.* at 442-43 (quoting *Burdett*, 103 Va. at 846); *see also Gilman v. Commonwealth*, 275 Va. 222, 227-28 (2008) ("In a summary adjudication, no evidence or further proof is required because the court has observed the offense.") (citing *Cooke v. United States*, 267 U.S. 517, 534 (1925)). In light of this procedure, direct contempt is also known as summary contempt. *Id.* at 442. Because summary contempt "is a proceeding 'to preserve the power and vindicate the dignity of the court,' it is criminal and punitive in character, and the guilt of the alleged contemnor must be established beyond a reasonable doubt." *Weston v. Commonwealth*, 195 Va. 175, 184 (1953) (quoting *Local 333B, United Marine Div. of Int'l Longshoremen's Ass'n v. Commonwealth*, 193 Va. 773, 779 (1952)).

Summary contempt is reserved for "exceptional circumstances . . . such as acts threatening the judge or disrupting a hearing or obstructing court proceedings." *Vaughn v. City of Flint*, 752 F.2d 1160, 1167 (6th Cir. 1985) (quoting *Harris v. United States*, 382 U.S. 162, 164

9

(1965)); s*ee* Code § 18.2-456(A).[2]  The exercise of the summary contempt power "is a delicate one and care is needed to avoid arbitrary or oppressive conclusions." *Scialdone*, 279 Va. at 442 (quoting *Cooke*, 267 U.S. at 539).  "Summary punishment always, and rightfully, is regarded with disfavor and, if imposed in passion or pettiness, brings discredit to a court as certainly as the conduct it penalizes." *Id.* at 443 (quoting *Sacher v. United States*, 343 U.S. 1, 8 (1952)).

While a "narrow exception" to due process requirements is carved out for summary contempt, that exception is limited to

---

[2] Code § 18.2-456(A) states,

"[t]he courts and judges may issue attachments for contempt, and punish them summarily, *only in the following cases*:

1. Misbehavior in the presence of the court, or so near thereto as to obstruct or interrupt the administration of justice;

2. Violence, or threats of violence, to a judge or officer of the court, or to a juror, witness, or party going to, attending, or returning from the court, for or in respect of any act or proceeding had, or to be had, in such court;

3. Vile, contemptuous, or insulting language addressed to or published of a judge for or in respect of any act or proceeding had, or to be had, in such court, or like language used in his presence and intended for his hearing for or in respect of such act or proceeding;

4. Misbehavior of an officer of the court in his official character;

5. Disobedience or resistance of an officer of the court, juror, witness, or other person to any lawful process, judgment, decree, or order of the court; and

6. Willful failure to appear before any court or judicial officer required after having been charged with a felony offense or misdemeanor offense or released on a summons pursuant to [Code] § 19.2-73 or 19.2-74.

(Emphasis added).

10

> charges of misconduct, in open court, in the presence of the judge, which disturbs the court's business, where all of the essential elements of the misconduct are under the eye of the court, are actually observed by the court, and where immediate punishment is essential to prevent 'demoralization of the court's authority' before the public.

*Id.* at 443-44 (quoting *In re Oliver*, 333 U.S. 257, 275-76 (1948)); s*ee also Davis v. Commonwealth*, 219 Va. 395, 398 (1978); *Burdette*, 103 Va. at 845-46. "If some essential elements of the offense are not personally observed by the judge, so that he must depend upon statements made by others for his knowledge about these essential elements," the case is not appropriate for summary contempt. *In re Oliver*, 333 U.S. at 275.

In indirect contempt cases, which have been described as "'matters that arise at a distance, and of which the court cannot have so perfect a knowledge,' courts must provide the full panoply of constitutional rights: notice of the charge, right to counsel, presumption of innocence, as well as the opportunity to present evidence and to cross-examine adverse witnesses." *Parham v. Commonwealth*, 60 Va. App. 450, 458 (2012) (quoting 4 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND *286 (1769)).

> [D]ue process of law . . . requires that one charged with contempt of court be advised of the charges against him, have a reasonable opportunity to meet them by way of defense or explanation, have the right to be represented by counsel, and have a chance to testify and call other witnesses in his behalf, either by way of defense or explanation.

*Oliver*, 333 U.S. at 275; s*ee Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 798-99 (1987). "[P]unishment without issue or trial [is] so contrary to the usual and ordinarily indispensable hearing before judgment, constituting due process, that the assumption that the court saw everything that went on in open court [is] required to justify the exception." *Scialdone*, 279 Va. at 444 (quoting *Cooke*, 267 U.S. at 536).

11

To determine whether summary contempt applies, we must first ask if the contemptible conduct occurred "in open court, in the presence of the judge" and whether "all of the elements of the misconduct [were] actually observed by the court[.]" *Id.* (quoting *Oliver*, 333 U.S. at 275). If the conduct serving as the basis for summary contempt occurred outside the presence of the court, we must next ask whether the contemnor was "advised of the charges against [her] and given a reasonable opportunity to meet them," including affording her the right to be represented by counsel, and the chance to testify and call other witnesses[.]" *Id.* (quoting *Cooke*, 267 U.S. at 537).

### B. The Present Case

First, it is common ground that a witness who appears in a courtroom while voluntarily intoxicated can be held in summary contempt, particularly where the intoxication disrupts orderly adjudication. The question in this case is whether, applying the standard of review, the behavior observed by the trial judge establishes beyond a reasonable doubt that Orndoff was voluntarily intoxicated. If summary contempt is not appropriate, a trial court is not powerless to vindicate its authority. However, it must proceed in a separate hearing, with the ordinary due process safeguards of notice, opportunity to present evidence, and the opportunity to test the evidence presented against the person charged with contempt.

Orndoff argues that the circuit court abused its discretion by summarily finding her in contempt for testifying while intoxicated. Orndoff contends that the trial judge did not personally witness all of the essential facts underlying the contempt finding while in open court. Specifically, she asserts that her posture and delivery of testimony did not constitute "misbehavior" and that the judge lacked personal knowledge of her use of any intoxicating

12

substance, aside from her own admission—given in response to the judge's question—that she had used marijuana prior to appearing in court. We agree.

At the outset, it is important to note that the circuit court's January 14, 2022, letter opinion clarified that it did not rely on Orndoff's admission to smoking marijuana prior to coming to court to find her in contempt.[3] This is in clear contradiction of the circuit court's contemporaneous statements during the contempt proceeding,[4] statements to counsel[5] and the

---

[3] "**No portion of the court's finding of contempt depended, in any way, upon knowing exactly how, when or where Ms. Orndoff became intoxicated, nor did it depend on the substances ingested.** In fact, the court found on the record that it would be purely speculative to discern what substance[s] Orndoff had consumed, as her partial admission was, to a degree confirmatory, but largely unreliable. So obviously, the court did not rely on her acknowledgment of having consumed marijuana immediately before driving to court." (DR Man. vol. 2, at 28) (emphasis in original).

[4] "THE COURT: You just testified that you, prior to coming to court today, before you got in the car, you smoked marijuana; is that correct?
THE WITNESS: Yeah.
THE COURT: All right. All right. The Court finds you in contempt of court[.]"
(Tr. vol. 2, at 130).

[5] When the Commonwealth asked the circuit court to reconsider its contempt ruling, the court declined to do so and explained, "Ma'am she admitted in this court to smoking marijuana today, to using . . . intoxicants and then voluntarily appearing and testifying in court, after driving here. That was her admission. She admits – she admitted to smoking marijuana." (Tr. vol 2, at 132-33).
The court declared a mistrial over both parties' objections. In response to the Commonwealth's argument that it should be allowed to rehabilitate Orndoff as a witness, the court explained, "I disagree. As I stated on the record, the witness was incoherent. Her body language was such that she was rocking forward in her chair, rocking back. When I asked her a question, she almost tipped her chair over. She clearly manifested signs of intoxication and *she admitted to smoking marijuana prior to driving over here.*" (Tr. vol 2, at 137) (emphasis added).
At the bond hearing on September 9, the circuit court again emphasized Orndoff's admission to smoking marijuana as part of the basis for its contempt finding. (Tr. vol. 2, at 251).

13

jury,[6] and its previous orders.[7]  Thus, the circuit court expressly modified its previous findings on this precise point.[8]  The dissent suggests that we are required to consider Orndoff's admission, even if the circuit court did not rely on it.  *Infra* at 4 n.1.  However, the circuit court found that Orndoff's admission was "largely unreliable." (DR Man. vol. 2, at 28).  The circuit court, sitting as factfinder, has the sole responsibility for determining the credibility of a witness.  *Commonwealth v. McNeal*, 282 Va. 16, 22 (2011).  On appeal, we are bound by this credibility determination with respect to Orndoff's admission.  *Id.*  As such, it cannot be considered as a basis to support the contempt conviction.[9]

---

[6]     During the testimony of Ms. Orndoff, the Court made some observations that it appeared that she may be under the influence of intoxicants.  There is no way to know that; but in my judgment, there was objective indicia of that.
    So when you were excused, I had asked the witness whether she had consumed anything that could cause intoxication today, prior to her testimony.  After some back and forth, she admitted to smoking marijuana today before she got in her car and drove here.  Whether that is true or not, I don't know, but that's what she said.
    Based on her appearance, my judgment about her appearance, *based on her admission to voluntarily appearing in court and testifying after consuming an intoxicating substance*, *she has been found in contempt*, and this court has declared a mistrial in this case.
(Tr. vol. 2, at 140-41) (emphasis added).

[7] In the conviction and sentencing order dated September 8, 2021, the circuit court emphasized that Orndoff admitted to smoking marijuana *one minute* prior to the contempt finding. (emphasis added).  In the nunc pro tunc order entered on September 22, 2021, the circuit court again noted Orndoff's admission to smoking marijuana.

[8] DR Man. vol. 2., at 15, n. 10 ("[A]ll prior findings, conclusions, and orders are continued in full force and effect unless specifically modified herein.").

[9] We have held that a court is permitted to ask some questions during a summary contempt proceeding "to clarify some detail."  *Scialdone*, 279 Va. at 447.  Because the circuit court ultimately disregarded Orndoff's answers to its questions, this case does not call upon us to clarify the scope of what questions are permissible.

Once Orndoff's admission to smoking marijuana prior to coming to court is removed from the equation, the record does not support the circuit court's conclusion that she was intoxicated while testifying. Specifically, the circuit court relied on her:

- "circuitous, rambling, and confused and sometimes incoherent" testimony;

- "peculiar hand, arm, and facial gestures" (DR Man. vol. 2, at 3);

- refusal to obey court orders, including "blurt[ing] out" prejudicial information 10 times *after* being admonished; and

- repeated slouching and rocking back and forth in her chair, including being "almost prone" and almost falling out of the chair.

However, a careful review of the record reveals numerous inconsistencies between the circuit court's articulated factual findings in its written orders and what is reflected in the video and transcript of the proceeding.

First, the record belies a finding that Orndoff's testimony was "incoherent." Although Orndoff seemed confused at times, she generally provided coherent responses to the questions posed. At times, Orndoff mentioned that she needed time to think before responding because the event occurred a year prior. As for Orndoff's "circuitous" testimony and demeanor, the Commonwealth proffered that two detectives would have testified that Orndoff's behavior that morning "was no different than her behavior previously. . . [;] that she is typically very animated; that she is typically very circuitous in terms of her responses; and that they didn't see any indicators of intoxication" that morning. (*Id.* at 131-32).

Second, although Orndoff's facial gestures are not captured on the video, her hand and arm gestures appear to be consistent with a person who talks with their hands, as explained in the proffer that the detectives would have testified that "she is typically very animated".

15

Third, the circuit court's assertion that Orndoff injected prejudicial information ten times *after* being admonished does not accurately reflect the chronology of the proceeding. While it is true that Orndoff referenced Phillips' arrest or incarceration status ten times throughout her testimony, the circuit court admonished Orndoff for the first time after the third reference, and arguably only twice throughout her entire testimony. Additionally, there is no evidence in the record of the agreement between the Commonwealth and defense counsel regarding the scope of Orndoff's testimony or precisely what Orndoff was told about this agreement.

Fourth, the video does not support the circuit court's factual findings that Orndoff was "almost prone" or almost fell out of her chair. While reasonable minds might differ as to whether Orndorff's shifting back and forth movement constituted rocking back and forth, the video does not depict Orndoff in an "almost prone" position or almost falling out of the chair. There is only one instance where the legs of Orndoff's chair lifted off the floor, but she quicky corrected herself.[10]

It is also worth mentioning that there is no evidence in the record of traditional indicia of intoxication, including slurred speech, bloodshot or glassy eyes, or an odor of alcohol or marijuana. *See Rozario v. Commonwealth*, 50 Va. App. 142, 144 (2007) (judge observed defendant's bloodshot eyes and odor of alcohol emanating from his person, which prompted judge to administer an Alcosensor test. Based on the personal observations and test results, the court convicted the defendant of contempt). The circuit court did not administer a drug or alcohol test prior to finding Orndoff in contempt. *See id.* at 144; *Graves*, 2014 Va. App. LEXIS

---

[10] This occurred in the middle of the contempt proceeding and was contemporaneously noted by the court.

at *3.[11]  There is no evidence in the record of the amount of intoxicating substances ingested to suggest that Orndoff was actively under the influence at the time of her testimony.[12]

The circuit court speaks through its orders.  *Roe v. Commonwealth*, 271 Va. 453, 457 (2006).  The circuit court's orders differ from what is depicted in the video.  To the extent that the facts in the written orders are embellished, the circuit court did not observe the facts upon which it purported to rely.  The inconsistencies and embellished factual findings are thus fatal.  *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024).

Finally, the circuit court had before it evidence that Orndoff had recently come off of her medication, medication she had been taking for 10 years.  She stated that it was affecting her.  The prosecution also proffered that two detectives would have testified that Orndoff's behavior that morning "was no different than her behavior previously. . . [;] that she is typically very animated; that she is typically very circuitous in terms of her responses; and that they didn't see any indicators of intoxication" that morning.

The circuit court observed behavior by Orndoff that was understandably a source of concern for the court.  The evidence personally observed by the judge in the courtroom, however, did not establish, beyond a reasonable doubt, that her behavior was attributable to voluntary intoxication.  In addition, some of the court's findings are not based on ambiguous or imprecise aspects of the record – they are contradicted by the record.  Consequently, holding Orndoff in summary contempt was not appropriate.

---

[11] This case does not call upon us to determine the authority of a trial judge to order or authorize drug or alcohol testing in the context of summary or indirect contempt or as a precursor to a criminal charge.  Accordingly, we express no opinion on the point.

[12] The circuit court did not – and could not – rely on the results of the *post-conviction* blood test for the contempt finding.

## C. The Errors Were Not Harmless

Having concluded that the circuit court abused its discretion, a harmless error analysis is statutorily required. Code § 8.01-678. Under the non-constitutional standard, an error is harmless if an appellate court "can conclude that the error did not influence the jury or had but slight effect." *Welsh v. Commonwealth*, 304 Va. 118, 140 (2025) (quoting *Commonwealth v. Kilpatrick*, 301 Va. 214, 216 (2022)). "To reach this conclusion, the evidence of guilt must be so overwhelming that it renders the error insignificant by comparison such that the error could not have affected the outcome." *Id.* (internal quotation marks omitted).

The circuit court's error had more than "slight effect" on the outcome of this case. *Id.* Therefore, the error was not harmless.[13]

## III. CONCLUSION

For the reasons stated, we find that the evidence was insufficient to support the circuit court's finding of summary contempt. Therefore, we reverse the judgment of the Court of Appeals, reverse the circuit court's judgment of contempt, and vacate the conviction.

*Reversed and final judgment.*

---

[13] Orndoff has raised a number of additional assignments of error. In light of our disposition, it is not necessary to address them. *Shareholder Representative Servs. v. Airbus Americas, Inc.*, 292 Va. 682, 689 (2016) (concluding that a dispositive assignment of error obviates any need to address other assignments of error).

18

JUSTICE MANN, concurring in the judgment.

Like all things in courtrooms, the moving parts are numerous, and trial judges often do many hard things all at the same time. I hope this concurrence will be helpful as to one of those moving parts. Contempt, by its very nature, is a distraction from the focus of any trial. When discipline issues arise and add more complications, judges should give themselves the gift of patience—if not with the discord, then at least with the process.

I have previously emphasized that "[w]hile we take great care and time in crafting these opinions, it is important to keep in mind that trial judges are required to resolve these issues in a matter of seconds or minutes." *Commonwealth v. Barney*, 302 Va. 84, 104 (2023) (Mann, J., dissenting). The reality of a trial judge's unique experience is but one reason we employ a deferential standard when we review their factual findings and evidentiary rulings. Only a trial judge can appreciate the mental and analytical gymnastics required dozens of times each day. If you have never done it, it is difficult to grasp just how tricky it can be.

That said, I fully agree with my dissenting colleagues that it is vital that trial judges have all the necessary tools to keep order in a courtroom so that hearings can proceed fairly, respectfully, and expeditiously. When things occur in a courtroom that a trial judge decides are inexcusable, that judge can and should act appropriately. But (and this is an important "but"), incarceration need not be the first option.

Maintaining the integrity of the judicial process requires recognition that criminal defendants are afforded rights and remedies under our Rules, the Virginia Code, and the Virginia and U.S. Constitutions. At the same time, alleged crime victims have a limited ability to enforce

19

those protections inside a courtroom; the protections they do have often come from the trial judge's willingness to engage with a non-party witness.[*]

Those of us who live our professional lives in courtrooms and courthouses understand the language and the culture. We know how to find the right courtroom. Or where the restroom is or where an infant can be fed privately. We do not need directional signs, and even if we did, we could understand the language on that sign. Many witnesses, on the other hand, feel anxiously adrift and become lost in the courthouse. They might experience fear and overwhelming intimidation on a consequential day.

So yes, with all that said, I appreciate that trial judges must make decisions quickly in many situations. But this is not that case.

Even mindful of missing the nuance in a cold record, on these facts (and a revealing courtroom video), this was not one of those times. The trial court did not have only seconds or minutes. Our rules include a specific set of procedures for when the behavior and conduct does not occur before the trial court; in those types of cases, the target of a contempt citation is afforded due process with a full hearing. Here, there was time—and it should have been taken.

This is especially important when considering these facts. A complaining witness—alleging brutal domestic violence—was placed in a courtroom within feet of her alleged abuser to testify against him. As I have often reminded people who are comfortable in courtrooms,

---

[*] Crime victims have certain rights under Article I, Section 8 of the Virginia Constitution and Code § 19.2-11.01. But those rights pertain, primarily, to matters pre- and post-adjudication. Even their "right" to remain in the courtroom during trial can be taken away. Also, even though this statute exists, a crime victim has no ability to seek enforcement of these protections. Should a crime victim complain about not receiving a notice of a hearing or that a victim impact statement was edited without input, more likely than not, that person would be directed to discuss the matter with the prosecutor assigned to the case. Crime victims, under this statute only have a voice in the courtroom to the extent a trial judge allows it.

there are others who, when they step through the courthouse doors, do not speak the awkward language of the law and do not understand the culture. The way people converse with their family and friends is worlds apart from how lawyers and judges communicate with each other. But many witnesses are unaware of this linguistic chasm. So when they are called to the stand and all eyes are upon them, and when a 20-foot walk to the stand feels like miles, and when asked to raise their hand and take an oath and then have a seat, it can be a chilling, disorienting, intimidating, and overwhelming process. Most people do not engage in public speaking in their everyday lives. Many have never used a microphone or needed an interpreter. Many witnesses do not even know where to look when testifying. And when it comes time for the talking, a mouth dry from nerves does not always cooperate.

For all the trial judges and lawyers reading this, how often have you noticed witnesses on the stand that sometimes forget to simply breathe? Or blink? Or try to talk while simultaneously trying not to cry? How many times have you observed, during an argument over an objection, a witness who looks like she has no idea what is happening? And then, after the trial court rules on the evidentiary issue and the collective attention of the courtroom returns to the witness, how often have you heard that witness ask, "Um, so do I answer the question?" I have spent over 35 years in courtrooms. When I was a trial judge, I spent more time in courtrooms than I did in my home. And with all of that, I remember the one instance I was called to the stand, and for me it was flat-out scary. And I was not even in trouble.

Under these kinds of circumstances, judges must take the time—and care—to ensure that we do not simply jerk a knee and lock up a witness based on our collective understanding of proper conduct. After all, a witness' understanding, informed by their reality and experience, might not parallel the trial court's understanding.

21

Especially on a record like this.

We *can* take the time. We *can* take the care necessary to obtain the facts—especially before we slap handcuffs on a domestic violence complainant. And even before an evidentiary hearing, other steps can be taken to address misconduct, especially if the conduct appears to be based more on fear or unfamiliarity rather than recalcitrance.

For example, the jury can be excused so that a judge can clarify, in plain English, what is expected of a witness. Then the trial court can ask if the witness understands and if there are any questions. This process has the added benefit of establishing a rapport and building trust in a difficult environment, possibly resulting in the delivery of coherent and helpful information to the trier of fact.

Or the trial judge may, with an admonition not to discuss the testimony in substantive fashion, request that the attorney who called the witness explain to them privately the way questions should be answered. If the jurisdiction maintains a victim services program, one of the staff members, who has built trust with the witness, can help as well.

If, after options like these are explored, the problem persists, then more drastic alternatives may be appropriate. And rather than starting with incarceration, a warning of contempt can be given. If that fails, a fine can be suspended and then imposed if necessary. And if that does not work, suspended jail time can be ordered. Then, as a last resort, a trial court can revoke the time previously suspended.

For those who may think all of this is too time-consuming, consider this: If the conduct persists after these kinds of steps are taken, then an expeditious summary contempt proceeding may be proper rather than a lengthy indirect contempt process because, at that point, the conduct will have occurred before the trial judge in the courtroom. Front-loading the time with education

22

and explanation proactively saves time and resources in imposing sanctions. So yes, education and explanation are the better path than an immediate sanctions proceeding. Such an approach also keeps the focus on why everyone is in the courtroom in the first place—which, in this case, was a felony prosecution with high stakes. That process deserved attention—not distraction or a mistrial.

The need for patience is especially acute for witnesses who are allegedly victims of crime. Assume for a moment, at least from the complainant's viewpoint, that the allegations are correct. Why would we as a court system want to ever—out of pique or something else—rapidly draw back the fist of contempt after a beaten, bruised, and choked person summons the resolve to confront a tormentor? How often are crime victims asked why they did not previously call the police? The answers, of course, are legion: It can be the hope that it will all just stop. Or worry that an arrest will make things worse. Or that, once that call is made, their housing and ability to feed a child becomes at risk. We, as judges, must take care that we are perceived as problem solvers. One way to do that is by inhibiting the creation of a chilling environment for those who seek hope, safety, and peace through the courts.

The law says what it says. But upholding the law with the restraint described in this concurrence adheres to the emphasis we place on decorum and courtesy in Virginia courtrooms. It also has the salutary benefit of cultivating efficiency and decency.

This is an important reversal, and I appreciate the opportunity to join in it.


JUSTICE CHAFIN, with whom JUSTICE KELSEY and JUSTICE RUSSELL join, dissenting.

The majority's opinion improperly curtails a judge's authority to summarily punish disruptive behavior that occurs in his presence. It is undisputed that a judge may rely on his own

first-hand observations of a witness's demeanor, speech, and physical condition when summarily addressing contemptuous conduct. A reasonable jurist observing Orndoff's behavior could readily conclude that her condition disrupted court proceedings and was punishable by a finding of contempt. Because the majority's opinion misapplies the deferential standard of review that is applicable in this context, I respectfully dissent.

A trial court's decision to exercise its contempt power is entitled to deference and is reviewed only for abuse of discretion. *Petrosinelli v. People for Ethical Treatment of Animals, Inc.*, 273 Va. 700, 706 (2007). "[A]n abuse of discretion cannot be shown merely because '[r]easonable trial judges and even some members of this Court, had they been sitting as trial judges in this case,' might have reached a different conclusion than the one under review." *Du v. Commonwealth*, 292 Va. 555, 564 (2016) (quoting *Coe v. Commonwealth*, 231 Va. 83, 88 (1986)). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Id.* (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)). If any rational trier of fact could have found contempt proven beyond a reasonable doubt, we must affirm the trial court's finding of contempt. *See Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016).

## A. Sufficiency of the Evidence

The authority to summarily punish contemptuous behavior committed in open court is indispensable to preserving the dignity of proceedings and protecting the administration of justice. *Cooke v. United States*, 267 U.S. 517, 536 (1925). This Court has long recognized that a judge who directly observes contemptuous behavior is "competent . . . to proceed upon [his] own knowledge of the facts, and to punish the offender without further proof, and without issue or trial in any form." *Scialdone v. Commonwealth*, 279 Va. 422, 443 (2010) (quoting *Burdett v. Commonwealth*, 103 Va. 838, 846 (1904)). Because the trial court is a firsthand witness to the

contemptuous conduct, it may employ a "form of procedure which dispenses with any further proof or examination and a formal hearing." *Higginbotham v. Commonwealth*, 206 Va. 291, 294 (1965).

The General Assembly codified the judiciary's longstanding authority to summarily punish contempt in Code § 18.2-456. Pursuant to Code § 18.2-456(A)(1), a court may summarily punish "[m]isbehavior in the presence of the court, or so near thereto as to obstruct or interrupt the administration of justice." The statute distinguishes between two categories of conduct: misbehavior occurring in the presence of the court and misbehavior occurring near the court that disrupts the proceedings. "Given the syntax and punctuation of this provision, the necessity for showing an actual obstruction or interruption of justice does not apply to misbehavior 'in the presence of the court' but only to misbehavior 'so near thereto.'" *Parham v. Commonwealth*, 60 Va. App. 450, 460 (2012). Accordingly, "[m]isbehavior the court directly sees or hears" may be punished summarily, while conduct outside the courtroom qualifies as contempt only if it obstructs or interrupts the administration of justice. *Id.*

While the majority correctly states that we must evaluate whether the circuit court personally observed the essential elements of contempt, it departs from that standard by reweighing the evidence rather than deferring to the circuit court's judgment. Where the record is ambiguous or imprecise, we view the evidence—and the circuit court's ruling—through the lens that favors the prevailing party below. The lack of perfect clarity in the circuit court's explanations does not license us to substitute our judgment for the circuit court's; it obliges us to resolve reasonable ambiguities in support of the judgment. Under settled law, the focus of the analysis should be whether a rational factfinder could conclude from the in-court conduct that Orndoff was intoxicated. *See Scialdone*, 279 Va. at 446. Like any other factual finding, a

25

contempt finding must be upheld if supported by competent evidence. *See Vasquez*, 291 Va. at 248. In this case, the circuit court directly witnessed Orndoff's erratic physical behavior, which was compounded by her increasingly incoherent testimony and repeated failure to follow the court's instructions. Orndoff's conduct unfolded before the circuit court and the jury, disrupted the orderly administration of a felony jury trial, and warranted the circuit court's exercise of its summary contempt authority.

Early in her testimony, Orndoff had difficulty providing responsive answers, prompting the Commonwealth to ask her to "just focus on the questions." Even though the parties had an agreement prohibiting reference to the defendant's criminal history, Orndoff repeatedly violated that limitation, stating that she "bailed [the defendant] out of jail," that he lived with her "until he got arrested," and that she paid his "bail bond." When the defense attorney objected, the circuit court instructed Orndoff to "just answer the questions as asked, but don't reference things like arrest, unless it's a specific question." Nevertheless, she continued, stating that the defendant was with her "24/7 when he wasn't incarcerated." The circuit court again directed her to "answer [the question] as asked." On cross-examination, she added that the defendant "got out of a felony abduction—like back in January," which led defense counsel to request a sidebar.

Outside the presence of the jury, the circuit court remarked that Orndoff appeared to be under the influence of narcotics or "some other type of substance." When asked if she had taken anything that might impair her, Orndoff stated that she had recently stopped taking her psychiatric medications and that she was feeling stressed and anxious. When the circuit court asked specifically what she had taken that day, Orndoff failed to respond directly, continuing to address prior questions. The circuit court observed: "You're not being responsive to my question. You appear to be under the influence at this time. Like for example, you just rocked in

26

your chair, and you almost fell over." In response to the circuit court's questioning, Orndoff admitted that she smoked marijuana that morning before driving to court.

The circuit court's observations were reflected in its written orders. The circuit court explained that while Orndoff initially provided coherent testimony, the final thirty minutes of her eighty-minute appearance "went downhill fast." Orndoff's answers became "circuitous, rambling and confused and sometimes incoherent," and the circuit court described her as "slouching forward and backward in her chair while, at times, making peculiar hand, arm and facial gestures."

The majority improperly isolates Orndoff's admission to using marijuana and treats it as the circuit court's only basis for its contempt finding. The circuit court described Orndoff's behavior as erratic and troubling before eliciting an admission of her marijuana use. The admission merely confirmed what the circuit court had already concluded based on its personal observations. To the extent the circuit court characterized aspects of Orndoff's statements as "unreliable," that characterization addressed the details, i.e., what substance, precisely when it was consumed, and in what location—not the core proposition that she knowingly ingested an intoxicant prior to testifying. In the circuit court's own framing, the admission was "to a degree confirmatory" of intoxication, even if its specifics were speculative. Viewing the record in the light most favorable to the prevailing party, we may consider the admission in that confirmatory capacity without reweighing credibility. The majority's contrary approach treats the circuit court's reasonable narrowing as a blanket rejection, which it was not.

27

"An appellate court must consider all the evidence admitted at trial that is contained in the record."[1] *Commonwealth v. White*, 293 Va. 411, 421 (2017). "In this respect, our appellate review 'is not limited to the evidence mentioned by a party in trial argument or by the trial court in its ruling.'" *Du*, 292 Va. at 566 (quoting *Perry v. Commonwealth*, 280 Va. 572, 580 (2010)); *see also Bolden v. Commonwealth*, 275 Va. 144, 147 (2008); *Commonwealth v. Jenkins*, 255 Va. 516, 522 (1998). The record in this case includes audio and video recordings of Orndoff's testimony and the circuit court's written and oral factual observations of her demeanor. When viewed as a whole, the evidence supports the circuit court's contempt finding.[2] The circuit court's observations satisfied the requirement that all essential elements of the contemptuous conduct be visible in open court.

In this case, I would hold that the circuit court properly held Orndoff in summary contempt pursuant to Code § 18.2-456(A)(1) based on the fact that she testified "as a witness in a felony jury trial in an intoxicated condition that caused unfair prejudice within the trial." Orndoff's behavior clearly constituted "[m]isbehavior in the presence of the court." *See Scialdone*, 279 Va. at 442-43. The circuit court's firsthand observations of Orndoff's erratic behavior, inability to follow instructions, and multiple violations of the circuit court's directives justified immediate sanction without the need for further proceedings.

---

[1] We are required to consider all evidence admitted at trial that appears in the record, including Orndoff's admission. Although the circuit court itself described that exchange as "to a degree confirmatory," the contempt finding did not depend on it. The circuit court's in-court observations satisfied the requirement that all essential elements were visible in open court.

[2] Even accepting the majority's interpretation of the video evidence and its rejection of certain findings by the circuit court, the record as a whole remains sufficient to uphold the contempt finding under the applicable standard of review.

The majority notes inconsistencies between the video recording of the trial proceedings and the circuit court's subsequent orders. While these inconsistencies may be troubling, they are inconsequential to the outcome of this case. The circuit court plainly observed the conduct giving rise to the finding of contempt. Summary contempt does not require that every factual detail of the contemnor's behavior be captured exactly in the trial court's orders. It is only required that the disruptive conduct take place in open court. While the circuit court's orders, particularly the nunc pro tunc order, reflected an inflated description of Orndoff's in-court behavior, the summary contempt ruling rests on what happened in the court room.

## B. Clarifying Questions

The majority concludes that the circuit court impermissibly relied on Orndoff's admission that she had smoked marijuana before testifying. This conclusion misconstrues the scope and objective of the circuit court's inquiry. The circuit court's brief exchange with Orndoff functioned solely to confirm what was obvious from Orndoff's conduct; it did not constitute an effort to engage in independent fact-finding, thus transforming the nature of the contempt from summary to indirect. The circuit court made clear that the particulars of intoxication—the "how, when, and where"—were immaterial. The dispositive question was whether Orndoff testified while intoxicated, a fact the court observed firsthand. The circuit court's brief questions served only to clarify that observation and to treat her statements as confirmatory rather than foundational.

As we explained in *Scialdone*, "[c]ircumstances will undoubtedly arise when a trial court observes the essential elements of the contemptible conduct, but nonetheless needs to ask questions to clarify some detail." *Id.* at 447. A trial court will often provide the contemnor with an opportunity to explain why he should not be held in contempt and ask questions in that regard.

29

*See Pounders v. Watson*, 521 U.S. 982, 985-86 (1997). Although we found that the circuit court in *Scialdone* violated the defendants' due process rights by conducting a summary contempt proceeding, the facts of the case before us compel a different outcome. Here, unlike in *Scialdone*, the circuit court did not embark on a mini-trial. It witnessed the essential elements in real time and posed only brief clarifying questions. Nothing in the record suggests that the circuit court relied on extra-record proof to establish contempt.

In *Scialdone*, one of the defendants, an attorney, offered a document purportedly from 2005, but the circuit court suspected it had been altered to remove a 2006 date. *Scialdone,* 279 Va. at 428. The judge questioned Scialdone and his law partner, as well as their secretary and law clerk, about whether someone in the law office had altered the document and demanded that someone "come clean." *Id.* at 429. The circuit court warned that they all would be held in contempt if no one took responsibility for the alteration. *Id*. "By the time [the circuit court] had completed its investigation, the circuit court had questioned four witnesses under oath, including the three defendants, and had obtained additional documents from the law office." *Id.* at 446. The circuit court sentenced the defendants without a full hearing. *Id.* at 433. On appeal, they argued that the summary contempt findings violated their due process rights. *Id.* at 439.

This Court concluded that the circuit court's contempt finding did not rest solely on its personal observations but also on the testimony of others, statements from the defendants, and additional evidence gathered through investigation. *Id*. We held that it was "clear that the circuit court did not 'have . . . personal knowledge' of the misconduct, . . . and that 'all of the essential elements of the misconduct' were not 'under the eye of the court.'" *Id.* (quoting *Cooke*, 267 U.S. at 535; *In re Oliver*, 333 U.S. 257, 275 (1948)). Further, we noted that nothing in the record indicated that the conduct at issue posed "such an open, serious threat to orderly procedure that

30

instant and summary punishment, as distinguished from due and deliberate procedures, was necessary." *Id.* at 446-47 (quoting *Harris v. United States*, 382 U.S. 162, 165 (1965)). Accordingly, we held that due process protections were required.

In the present case, the circuit court directly witnessed Orndoff's contemptuous conduct—erratic behavior, incoherent testimony, and repeated disregard of the circuit court's instructions—all of which occurred in open court. In stark contrast from the facts in *Scialdone*, the circuit court's questioning of Orndoff was not an intensive fact-finding exercise. The exchange between the circuit court and Orndoff was a brief and permissible effort to clarify conduct that the circuit court had already personally witnessed. Indeed, Orndoff's admission to using marijuana only confirmed what was already evident from her behavior. This limited exchange did not convert the nature of the contempt from summary to indirect, and therefore did not require the full panoply of due process protections.

## C. Conclusion

Virginia has long recognized that a court must have the ability to summarily address acts that obstruct justice, disrespect the court, or undermine its authority. *See Carter v. Commonwealth*, 96 Va. 791, 809 (1899). The majority's decision will needlessly limit the ability of trial courts to manage courtroom misconduct as it occurs.

The circuit court observed firsthand Orndoff's erratic behavior, incoherent testimony, and repeated disregard of its instructions—all of which disrupted a felony jury trial and eventually resulted in a mistrial. Orndoff's behavior alone was sufficient to support a summary contempt finding. Although parts of the proceeding and the circuit court's later explanations were less than clear, our standard of review—giving deference to the trial court's observations and viewing the evidence in the light most favorable to the prevailing party—compels affirmance. Because

31

the circuit court acted within its summary contempt authority and the record supports its

decision, I dissent.